Antonio J. BACA, in his capacity as personal representative of the Estate of Josefa A. Baca, Plaintiff–Appellant,

v.

Bruce KING, in his individual capacity; Sam King, doing business as King Brothers Partnership, a New Mexico General Partnership; Don King, doing business as King Brothers Partnership, a New Mexico General Partnership; Bruce King, doing business as King Brothers Partnership, a New Mexico General Partnership; Manuel Lujan, in his individual capacity; Bruce Babbitt, in his official capacity as the Secretary of the United States Department of the Interior; Larry Woodard, in his individual capacity; Monte Jordan, in his official capacity as Acting New Mexico State Director of the United States Bureau of Land Management; Albert Abee, in his individual capacity and in his official capacity as Area Manager of the Rio Puerco Resource Area of the United States Bureau of Land Management, Defendants–Appellees.

No. 94–2237.

United States Court of Appeals,
Tenth Circuit.

Aug. 8, 1996.

Jeffrey J. Buckels, Albuquerque, New Mexico, for Plaintiff–Appellant.

John B. Pound of Herrera, Long & Pound, Santa Fe, New Mexico, for Appellees Bruce King, Sam King and Don King.

William B. Lazarus, Attorney, Department of Justice, Washington, D.C. (Lois J. Schiffer, Assistant Attorney General, John J. Kelly, United States Attorney, and John W. Zavitz, Assistant United States Attorney, Albuquerque, New Mexico; Susan V. Cook and Robert L. Klarquist, Attorneys, Department of Justice, Washington, D.C., with him, on the brief), for Appellees Manuel Lujan, Bruce Babbitt, Larry Woodard, Monte Jordan and Albert Abee.

Before HENRY, LIVELY * and MURPHY, Circuit Judges.

LIVELY, Circuit Judge.

In this appeal, the plaintiff seeks review, under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1988), of a land exchange carried out by the Department of Interior's Bureau of Land Management (BLM). Specifically, he claims that the exchange violated the equal value requirement of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1716(b) (1988). For the following reasons, we affirm the order of the district court.

## I.

### A.

The plaintiff, Antonio J. Baca, maintains a cattle ranch in Santa Fe County, New Mexico. His ranch is made up of private fee land, private lease land and state and federal lease land. For over half a century, Mr. Baca's family grazed cattle on 2,758.57 acres of land in Santa Fe County belonging to BLM under the terms of a federal grazing permit. The permit by its own terms was subject to "modification, suspension or cancellation as required by land plans and applicable law...." Permit, Aplt.App. at 545.

On December 31, 1987, Congress created the El Malpais National Monument and Conservation Area (El Malpais) in New Mexico and authorized the Secretary of the Interior to acquire lands within the monument and conservation area by exchange. 16 U.S.C.

---

* The Honorable Pierce Lively, United States Circuit Judge for the Sixth Circuit, sitting by designation.

§§ 460uu *et seq.* (El Malpais Act). Thereafter, BLM proposed that isolated tracts of federal land in the Santa Fe area be disposed of by sale or exchange due to their limited value for resource purposes. Reports prepared by BLM on the proposal gave the highest priority to exchanges and recognized that the holders of grazing permits for lands to be sold or exchanged would be entitled to two-years' notice and compensation for improvements on the land. BLM held public hearings and provided an opportunity for public comment on the proposal. Mr. Baca was among those who commented on the proposal.

In September 1988, King Brothers Partnership (the King Brothers) met with BLM's New Mexico director, Larry L. Woodard, to express interest in negotiating an exchange for certain BLM lands west of Santa Fe. By December 1991, the King Brothers and BLM had entered into a Land Exchange Agreement providing, in part, for the exchange of 22,437.15 acres of the King Brothers' land in and adjacent to El Malpais in Cibola County, New Mexico for 1,173.08 acres of public lands near Santa Fe. Some of the Santa Fe land for which Mr. Baca held a grazing lease was offered as part of this exchange. The agreement provided that the exact acreage to be exchanged could be adjusted after the land parcels had been appraised.

By letter dated January 15, 1992, BLM gave Mr. Baca the required two-years' notice of cancellation of his grazing permit due to the proposed disposal of public lands. Therefore, his permit would terminate on January 15, 1994. On or about April 14, 1992, a Notice of Realty Action (NORA) was printed in the Federal Register by BLM, inviting the public and interested parties to submit comments on the proposed exchange within 45 days. Mr. Baca, along with others, submitted in writing his opposition to the exchange.

**B.**

BLM and the King Brothers each engaged an independent certified real estate appraiser who produced appraisals of the offered and selected lands. The chief review appraiser at the state BLM office reviewed and approved the valuations ascribed to the properties by BLM's appraiser "for exchange purposes."

After negotiating over the differences in the two appraisals, in September 1992, BLM and the King Brothers arrived at compromise values for the Cibola County and Santa Fe County land. They agreed that the value of 22,269 acres of the King Brothers' land was $2,000,000 and that they would use the BLM appraiser's estimate of $2700 per acre for the valuation of the Santa Fe land. The parties then reduced the acreage of the El Malpais land offered for the exchange by about 4300 acres, agreeing that the value of the resulting smaller parcel was $1,685,000. In return, the partnership was to receive 740 acres of the Santa Fe land, to be selected by the King Brothers from anywhere in the 1160–acre tract and valued at $2700 per acre or $1,998,000. Finally, the values of the two parcels were equalized because the parties agreed that the value of the land in Santa Fe should be discounted by 12 percent for 18 months (a reduction of $315,000) to account for Mr. Baca's current occupation of the land, which would delay development by the King Brothers. Thus, the King Brothers were to receive 740 acres in Santa Fe, valued at $1,683,000, in exchange for 17,921 acres in El Malpais, valued at $1,685,000.

Mr. Baca again wrote to BLM on November 6, 1992, this time proposing to purchase all public lands covered by his grazing permit. However, on November 18, the Assistant Secretary of the Department of Interior issued a final decision addressing and dismissing the protests received in response to the NORA. Despite the protests, the Assistant Secretary determined that "the public interest will be well served by completing this exchange." Decision, Aplt.App. at 487. On December 2, Mr. Baca was sent a copy of the Assistant Secretary's final decision and informed that BLM would pursue the exchange rather than sell to him.

Between December 1992 and February 1993, the land exchange between BLM and the King Brothers took place in three installments and in a somewhat different form than originally anticipated. Ultimately, the King Brothers received 800 acres of the Santa Fe

land, which included all of the more valuable northern area and a portion of the more valuable middle area. The less valuable southern end was not involved in the exchange. In addition, they received 697 acres of BLM land near Stanley, New Mexico. In exchange, the federal government received a total of nearly 21,000 acres of the King Brothers' land in Cibola County, along with some of the wells and water rights on that land.

## II.

Mr. Baca filed suit in federal court against the former and current Secretary of the Interior and several BLM officials (collectively, the federal defendants), as well as against the King Brothers partners. His complaint sought to restore the former BLM land to federal ownership and to reinstate his grazing privileges, claiming that the land exchange should be declared void and set aside because the defendants' actions violated the FLPMA, 43 U.S.C. §§ 1701–1784; the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; and the Taylor Grazing Act, 43 U.S.C. §§ 315–315r. Compl., Aplt.App. at 25–30. The complaint also sought *Bivens* remedies for alleged violations of his Fifth and Fourteenth Amendment rights. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

The district court dismissed all but Mr. Baca's FLPMA claim under the APA in March 1994. The court then remanded the case to the Department of the Interior for supplementation of the administrative record. Although the dismissal of the *Bivens* claims was certified by the lower court as a final appealable judgment, Mr. Baca did not appeal from that dismissal.

The defendants renewed their motions for summary judgment when the supplementation was completed. After considering the parties' briefs and oral arguments, the court

ruled from the bench, granting summary judgment [1] in favor of the defendants on Mr. Baca's remaining claim. The court explained that there was no basis on the record for holding BLM's land exchange to be arbitrary and capricious. The court entered an order granting summary judgment on the following day.

Mr. Baca now appeals from that order, relying solely on the claim that BLM acted arbitrarily and capriciously because the lands exchanged were not of equal value, in violation of section 206(b) of the FLPMA, 43 U.S.C. § 1716(b). Specifically, he claims that the land the King Brothers actually received was worth far more than that which they gave in trade, and that the discount was unjust. He does not claim, however, that BLM erred in adopting its own appraiser's valuations. He has abandoned his earlier FLPMA–related claims that the exchange was not in the public interest, as required by 43 U.S.C. § 1716(a); that the NORA for the proposed exchange required by regulation failed to identify the lands actually exchanged; and that he was not given two-years' notice of the cancellation of his lease or compensated for the improvements he made on the public lands, as required by 43 U.S.C. § 1752(g).

## III.

The federal defendants argue for the first time on appeal that the district court lacked subject matter jurisdiction over this case because Mr. Baca lacked a "valid cause of action" and "standing" under the FLPMA to challenge the land exchange at issue. Although issues not raised below normally may not be considered on appeal, defenses challenging this court's jurisdiction may be raised at any time. *Horwitz v. State Bd. of Medical Examiners*, 822 F.2d 1508, 1512 (10th Cir.), cert. denied, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987); see also *Sierra Club v. Hodel*, 848 F.2d 1068, 1076 n. 6 (10th Cir.1988) (issue of whether a private

---

1. The district court's "summary judgment" was entered four months before this court decided *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir.1994), which explained that "motions for summary judgment are conceptually incompatible" with a district court's review of

agency action under the APA. Despite its poor choice of nomenclature, however, the district court properly applied the "arbitrary and capricious" standard, rather than the standard for summary judgment under Fed.R.Civ.P. 56(c), in its review of the land exchange.

right of action existed could be properly considered for the first time on appeal); *Board of County Comm'rs v. W.H.I., Inc.*, 992 F.2d 1061, 1063 (10th Cir.1993) ("Standing may be raised at any time in the judicial process.").

### A.

Mr. Baca's counsel insisted at oral argument that the government was precluded from challenging this court's jurisdiction because of the "law of the case." He asserted that the district court's order dismissing the *Bivens* claims "for failure to state a claim under the rationale of *Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988)," created law of the case which binds this court to the conclusion that Mr. Baca may seek redress for FLPMA violations under the APA. In *Chilicky*, the Supreme Court found that Social Security claimants who alleged violations of their due process rights had no *Bivens* remedy because Congress "ha[d] not failed to provide meaningful safeguards or remedies" under the administrative scheme of the Social Security system. *Chilicky*, 487 U.S. at 425, 108 S.Ct. at 2468.

The essence of counsel's position is that the government succeeded in having the *Bivens* action dismissed by insisting that Mr. Baca had an alternative remedy under the APA. He argues that having obtained dismissal of the *Bivens* claim on this basis, the government cannot now argue that Mr. Baca has no standing to proceed under the APA.

■ Mr. Baca could have sought review of the district court's dismissal pursuant to the district court's certification. As counsel conceded at oral argument, his failure to appeal foreclosed further reliance on a *Bivens* claim. Mr. Baca's failure to appeal this adverse ruling did not, however, preclude the government from raising the standing issue. His counsel's law of the case argument is misplaced. One application of the "law of the case" doctrine gives an appellate court discretion to refuse to reconsider an issue decided at an earlier stage of the litigation. It is not a fixed rule that prevents a federal court from determining the question of its own subject matter jurisdiction in a given case. *Potomac Passengers Ass'n v. Chesapeake & Ohio Railway Co.*, 520 F.2d 91, 95 n. 22

(D.C.Cir.1975). The question properly before this court is whether under the facts of this case, Mr. Baca has standing to maintain a proceeding in federal court designed to force BLM to revoke its exchange decision, retake title to the Santa Fe property, and grant him a new grazing permit.

### B.

■ Standing is a threshold requirement, determined with reference to both constitutional limitations on federal court jurisdiction in Article III and prudential limitations on the exercise of that jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). At a minimum, the constitutional dimension of standing requires: (1) that the plaintiff "suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical'"; (2) that the injury is "'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court'"; and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and some internal quotation marks omitted); see also *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Prudential standing under the APA in this case involves the question of whether the plaintiff is within the "zone of interests" sought to be protected by the FLPMA, *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 395–96, 107 S.Ct. 750, 754–55, 93 L.Ed.2d 757 (1987); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883, 886, 110 S.Ct. 3177, 3186, 3187, 111 L.Ed.2d 695 (1990); *Air Courier Conference v. American Postal Workers Union*, 498 U.S. 517, 523–24, 111 S.Ct. 913, 917–18, 112 L.Ed.2d 1125 (1991), and whether any "indicators" in the

FLPMA make "'fairly discernible' a congressional intent to preclude review at [plaintiff]'s behest," *Clarke,* 479 U.S. at 400, 403, 107 S.Ct. at 757, 759. It is the plaintiff who must establish these elements of standing in order to justify his invocation of the adjudicatory and remedial powers of the federal courts. *Warth,* 422 U.S. at 518, 95 S.Ct. at 2215; *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2136.

■ In order to satisfy the "redressability" requirement for constitutional standing, a plaintiff must show that there is at least a "'substantial likelihood' that the relief requested will redress the injury claimed...." *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978); see also *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 45–46, 96 S.Ct. 1917, 1927–28, 48 L.Ed.2d 450 (1976). Accordingly, this court has found no standing on the ground that "the loss of the possibility of obtaining a federal lease is not redressable by a favorable decision." *Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1451 (10th Cir. 1994) (citing *Ash Creek Mining Co. v. Lujan,* 969 F.2d 868, 875 (10th Cir.1992)). In *Ash Creek,* a mining company brought suit to set aside an exchange of government coal rights for a conservation easement between the Department of Interior and a private organization. *Ash Creek,* 969 F.2d at 870–71. The company claimed injuries in part due to its lost opportunities to participate in competitive leasing of the federal coal. *Id.* at 873–74. This court agreed with the district court's conclusion that the mining company lacked standing because the court was simply not empowered to fashion the ultimate relief the plaintiff sought—an order that the government offer the coal for competitive leasing in the first place. *Id.* at 874–75; see also *Wyoming ex rel. Sullivan v. Lujan,* 969 F.2d 877, 881 (10th Cir.1992). Likewise, in *Mount Evans,* we held that a private company did not have standing in a suit to compel the United States Forest Service to rebuild a structure destroyed by fire on government lands. *Mount Evans,* 14 F.3d at 1451. We explained that even if the court ordered that the structure be rebuilt, there was no guarantee that the company would be awarded the concession contract which it sought in order to continue its retail business within the structure. *Id.* at 1448, 1451; see also *Glover River Org. v. United States Dep't of Interior,* 675 F.2d 251, 255 (10th Cir.1982); *Oklahoma Hosp. Ass'n v. Oklahoma Publishing Co.,* 748 F.2d 1421, 1425 (10th Cir.1984), *cert. denied,* 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 652 (1985).

In his complaint, filed in May 1993, Mr. Baca claimed standing based on numerous economic injuries that he predicted he would suffer as a result of the loss of his grazing rights on the Santa Fe land after January 1994, when his permit was to expire. See Compl., Aplt.App. at 4–5, 24–26. He did not and could not allege injury based on any actual or anticipated interference with his right to use the land until January 1994, since he was allowed to occupy the land for the requisite two-year period following his notice of cancellation. See 43 U.S.C. § 1752(g) (requiring two years' prior notification for cancellation of a grazing lease). In fact, the parties agreed to allow Mr. Baca to use the land throughout the pendency of the lower court proceedings. Tr., Aplt.App. at 390–91.

■ Assuming that the threat of future economic injury alleged by the plaintiff was sufficiently concrete and imminent to establish injury in fact, Mr. Baca, nevertheless, has not shown a "substantial likelihood" that his injury will be redressed by a favorable decision. See *Duke Power,* 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20.

It is unclear precisely the type and extent of redress which Mr. Baca seeks for his injuries. Among the forms of relief he sought in his complaint for the alleged FLPMA violations were: (1) "a declaration that the exchange was and is not in the best interest of the public within the meaning of FLPMA and was completed in violation of Plaintiff's rights pursuant to FLPMA and the Taylor [Grazing] Act"; (2) "a permanent injunction, voiding the exchange, ordering the exchange lands to be reconveyed to the BLM and *restoring Plaintiff's grazing privileges* "; and (3) a remand of the exchange "to the Department of the Interior and/or the

BLM" accompanied by an injunction requiring the agency "to provide Plaintiff with a hearing on the exchange as required by the Taylor Grazing Act" and *"to accord Plaintiff his first right to purchase the exchange lands"* pursuant to 43 C.F.R. § 2711.3–3(a)(3). Compl., Aplt.App. at 13, 26–27 (emphasis added). In his appellate brief, he asked this court only "to reverse the district court and remand this case with instructions to the district court to declare the exchange unlawful and set it aside." Aplt. Brief at 30; see also *id.* at 18. And at oral argument, Mr. Baca's counsel suggested Mr. Baca might be satisfied simply with a remand to the agency for a reformulation of the exchange.

Of the different remedies requested, however, only the renewal of Mr. Baca's grazing permit or the sale of the land to him would likely redress his claimed injuries. Such relief is beyond our authority to give. No court has the power to order the BLM or the Department of Interior to grant Mr. Baca another grazing lease, because the very determination of whether to renew grazing permits and whether public lands should even be designated for grazing purposes are matters completely within the Secretary of Interior's discretion. 43 U.S.C. §§ 315, 315b; *Mollohan v. Gray,* 413 F.2d 349, 352–53 (9th Cir. 1969); see also *Mount Evans,* 14 F.3d at 1451. By the same token, we cannot compel the agency to sell the Santa Fe land to Mr. Baca, and we find no "first right of purchase" for Mr. Baca in either 43 C.F.R. § 2711.3–3(a)(3) or his actual permit. Thus, even if we have the power to void the exchange as unlawful and the power to enjoin such an exchange, which we do not decide, there would still be no assurance that Mr. Baca's injuries would actually be remedied. We recognize that " '[s]tanding jurisprudence is a highly case-specific endeavor, turning on the precise allegations of the parties seeking relief.' " *Sullivan,* 969 F.2d at 882 (quoting *National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 703–04 (D.C.Cir.1988)). Based on the record before us, Mr. Baca failed to establish "a substantial nexus between the relief requested and the elimination of [his] injury." *Glover River,* 675 F.2d at 255. Because we find no Article III standing, we do not address whether prudential limitations would preclude review of the plaintiff's claim. See *Mount Evans,* 14 F.3d at 1451 ("We conduct a prudential standing analysis only after Article III standing has been established.").

The judgment of the district court dismissing the action is AFFIRMED.