DESERT CITIZENS AGAINST POLLU-TION, Sierra Club and Desert Protective Council, Plaintiffs,

v.

Henri R. BISSON, Terry A. Reed, Michael Dombeck, and United States Bureau of Land Management, Defendants,

and

Gold Fields Mining Corp. and Arid Operations Inc., Intervenors.

No. Civil 96–2011–B(JFS).

United States District Court, S.D. California.

Jan. 30, 1997.

William S. Curtiss, Hank Bates, Sierra Club Legal Defense Fund, San Francisco, CA, for plaintiff.

Alan D. Bersin, U.S. Attorney and Tom Stahl, Assistant U.S. Attorney, San Diego, CA, for Defendants.

, Charles L. Kaiser, Charles A. Breer, Davis, Graham & Stubbs, Denver, CO., Charles H. Dick, Jr., Michael P. McCloskey, Baker & McKenzie, San Diego, CA, for Intervenors.

## ORDER AND JUDGMENT OF DISMISS- · AL AND ALTERNATIVE ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BREWSTER, District Judge.

On January.17, 1997, the above captioned matter came on regularly for hearing upon Plaintiffs' motion for a preliminary injunction. Upon due consideration of the moving and responding papers and the arguments of counsel at hearing, the Court hereby concludes that Plaintiffs lack standing, and therefore the Court DISMISSES Plaintiffs'. case for want of jurisdiction. Alternatively, should it be found that the Court has jurisdiction, the Court hereby DENIES Plaintiffs' motion for preliminary injunction.

## I. BACKGROUND

### A. Procedural and Factual Background

Desert Citizens Against Pollution, Sierra Club and Desert Protective Council (Plain-

tiffs) challenge the decision by the Bureau of Land Management ("BLM" or "Bureau") to approve a proposed exchange of federal land in Imperial County for private property in Imperial and Riverside Counties. The decision to approve this land exchange is embodied in the "Record of Decision" ("ROD") signed on February 14, 1996 by Defendant Henri R. Bisson, BLM's Manager of the California Desert District, and Terry A. Reed, the Area Manager of the El Centro Resource Area. On December 12, 1996, this Court granted Gold Fields Mining Corp. and Arid Operations' (collectively "Gold Fields") motions to intervene. The Plaintiffs are now moving for preliminary injunctive relief that would prohibit the Defendants from completing the real estate transaction that would carry out the ROD during the pendency of this litigation.

## B. The Proposed Mesquite Regional Landfill

The Mesquite Regional Landfill is a project sponsored by Gold Fields Mining Corporation, Western Waste Industries and Southern Pacific Environmental Systems, who have jointly engaged Arid Operations, Inc., a subsidiary of Gold Fields, to develop and operate the landfill on their behalf. The project includes plans for an above-ground landfill that would dispose of municipal solid waste shipped by rail from urban areas in Southern California. The landfill is intended to contain ultimately 600,000,000 tons of garbage. The project has a 100–year life expectancy, with over $500,000,000 expected to be spent on the project in the first 20 years. During the same 20 year period, the County expects to derive more than $100,000,000 in "host fees" from the operation of the landfill.

The land exchange that forms the basis of the project would allow Gold Fields to acquire federal property currently managed by the BLM. Of the 4,245 acres included as the planned site, approximately 1,745.47 acres or 40% is federal land ("selected lands"). To allow the project to materialize, the BLM has approved the trade of the selected lands in return for six parcels of private property totaling 2,642.17 acres ("offered lands"). According to the ROD, in total, the selected lands are appraised at $610,914.50 ($350.00 per acre), and the offered lands at $609,995.40. The $919.10 difference in value is to be paid in cash by Gold Fields to the United States.

The ROD represents the BLM's final action on the package of approvals necessary for the Mesquite Regional Landfill project. The ROD announces a joint decision by the El Centro Resource Area Manager and the Desert District Manager to approve and complete the land exchange.

## II. DISCUSSION

### A. Standards of Law

In the Ninth Circuit, the test for granting a preliminary injunction has been formulated as requiring the plaintiff to show either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions have been raised and the balance tips sharply in its favor. *Dollar Rent A Car v. Travelers Indem. Co.*, 774 F.2d 1371, 1374–75 (9th Cir. 1985); *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir.1986).

However, before this Court reaches the merits of the preliminary injunction motion, it must determine whether the Plaintiffs have standing to bring this action. In order to establish standing, a "plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct [3] likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Additionally, in cases seeking review of an administrative decision under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1988), prudential limitations must also be addressed by showing that, in this case, the Plaintiffs are within the "zone of interests" sought to be protected by the Federal Land Policy and Management Act (FLPMA).

### B. Standing Analysis

In order to determine if the Plaintiffs have standing to bring this action, it is important to review the applicable statutory and regulatory provisions at issue in this case as well as the alleged violations of these statutes and

regulations that Plaintiffs claim entitle them to relief.

### 1. FLPMA

In the Federal Land Policy and Management Act of 1976 (FLPMA), Congress declared a national policy that "the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest." 43 U.S.C. § 1701(a)(1). Consistent with that over-arching policy, Section 206 of the FLPMA authorizes the Secretary of the Interior to dispose of public lands by exchange when certain conditions are satisfied. First, the Secretary must "determine[ ] that the public interest will be well served by making that exchange," after taking certain factors into consideration. 43 U.S.C. § 1716(a). Second, the Secretary must also specifically find "that the values and objectives which Federal lands ... to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands ... and the public objectives they could serve if acquired." *Id.* Finally, the "values of the lands exchanged by the Secretary under this Act ... shall be equal" or made equal by a limited cash payment. 43 U.S.C. § 1716(b). To assure that the public will receive value in any exchange of federal lands, Section 206(d) of the FLPMA specifically directs that the Secretary "shall" obtain and consider an appraisal of the affected lands' market value. 43 U.S.C. § 1716(d).

### 2. BLM Land Exchange Regulations

The BLM's regulations implementing the requirements of Section 206 for land exchanges are found in 43 C.F.R. Part 2200. These regulations provide that no decision by the Bureau to approve a proposed exchange may be made until completion of the necessary documentation, which includes the appraisal mandated by Section 206. 43 C.F.R.

§ 2201.7–1(a). That appraisal must determine the "market value" of the affected lands, based on the "highest and best use" of the appraised property, and estimate its market value "as if in private ownership and available for sale in the open market." 43 C.F.R. § 2201.3–2(a)(1)–(2). The regulations provide definitions for both "market value" and "highest and best use."[1] The report documenting the appraisal must, in addition, set forth certain supporting information specified in 43 C.F.R. § 2201.3–3, including an analysis of "highest and best use" and a "description of comparable sales, including a description of all relevant physical, legal and economic factors." 43 C.F.R. § 2201–3.3(d), (g).

Each appraisal report that is not prepared by the BLM staff must then be reviewed by another qualified appraiser and a written review report prepared that documents the conclusions of the review. 43 C.F.R. § 2201.3–4. The reviewing appraiser is not required to independently verify any of the information or assumptions upon which the original appraisal was based, but the review appraiser has a duty to determine whether the appraisal report "reasonably estimates the probable market value of the land appraised." 43 C.F.R. § 2201–3.4(b)(3).

It is the BLM's alleged failure to properly comply with these regulations that forms the basis for Plaintiffs' claims. More specifically, Plaintiffs allege that the BLM's approval of the land exchange did not comply with Section 206(a) of the FLPMA which requires the BLM to assure that the market value of the selected lands be equal to the value of the private offered lands and cash given in trade because the BLM failed to consider factors essential to determining the market value of those public lands. In particular, Plaintiffs contend that the BLM failed to consider the possibility that the selected lands could be most valuable for use as a landfill, and thus concluded that the exchange was equal with-

---

1. "'Highest and best use' means the most probable legal use of a property, based on market evidence as of the date of valuation, expressed in an appraiser's supported opinion." 43 C.F.R. 2200.0–5(k). "'Market value' means the most probable price in cash, or terms equivalent to cash, that lands or interests in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably, and the price is not affected by undue influence." 43 C.F.R. 2200.0–5(n).

out considering a fundamental aspect of market value.

Additionally, Plaintiffs contend that the BLM's failure to consider whether the appraisal of the selected lands should be updated given that the appraisals of the selected lands were prepared in June and August 1994 and BLM's approval did not come until February 1996 was arbitrary and capricious.

### 3. The Standard of Review under the APA

The Administrative Procedure Act (APA) provides for judicial review of the actions taken by "each authority of the Government of the United States," except where review is otherwise barred by statute or the action is "committed to agency discretion by law." 5 U.S.C. § 701. The applicable standard for that review is provided by Section 10(e) of the APA, which directs that a court **"shall"**:

> hold unlawful and **set aside** agency action ... found to be—
>
> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law; [or]
>
> .    .    .    .    .
>
> (C) in excess of statutory jurisdiction, authority, or limitations....

5 U.S.C. § 706(2) (emphasis added).

In the instant case, Plaintiffs allege that the disputed land exchange approval is both arbitrary, capricious and an abuse of the BLM's discretion and exceeds the limitations on the BLM's authority to exchange public lands under the FLPMA and its implementing regulations. In other words, if successful on the merits, the relief requested by the Plaintiffs is for this Court to set aside the BLM's approval of the land exchange as mandated by the APA.

### 4. Standing Analysis

Plaintiffs assert several bases for standing. First, Plaintiffs allege standing based on the unauthorized termination of their members' use and enjoyment of the selected lands for aesthetic and recreational purposes. The Declaration of Edie Harmon in Support of the Motion for Preliminary Injunction shows that Ms. Harmon is a member of both the plaintiff Sierra Club and plaintiff Desert Protective Counsel (DPC). Ms. Harmon allegedly visits the selected lands for recreational, aesthetic, and scientific enjoyment. For those same purposes, she is also among those who visit other BLM lands in the immediate vicinity of the landfill project that would be affected if the project were built for the same purpose. Plaintiffs claim that the disputed land exchange would directly injure her use and enjoyment of those public lands in two ways. First, the exchange would eliminate her future use and enjoyment of the selected lands that are to be conveyed to Gold Fields. Second, plaintiffs assert that the landfill project that could not be built, but for the disputed land exchange will also injure her ongoing use and enjoyment of neighboring public lands whose solitude, scenery and natural character would also be impaired by the landfill's operation.

Plaintiffs further contend that as a result of the alleged undervaluation of the selected lands, the BLM received a smaller amount of private lands than would be acquired through a proper appraisal. *See* Plaintiffs' Reply, p. 1–2, n. 2. As a result, Plaintiffs claim that they are "directly injured by the reduced opportunities for them to use and enjoy the expanded national park units and wilderness area" that could possibly be acquired by the BLM from a "proper" evaluation of the selected lands. *See id.*

In order to determine whether Plaintiffs have adequate standing to bring this suit, the Court has surveyed the case law addressing standing in general and more specifically those cases involving challenges to government land exchanges. In aligning the cases cited by the Plaintiffs with those cited by the Defendants and Intervenors, a connection between the courts' holdings and the type of challenge raised by the Plaintiff becomes clear. The cases that have found standing all involve alleged noncompliance with an environmental statute or regulation. In contrast, those cases that involve an attack on the way that federal money is spent (i.e., noncompliance with the equal value determination requirement) have denied standing to Plaintiffs

claiming a harm similar to the one Plaintiffs assert in the instant case.

Plaintiffs cite numerous cases to support their position that they have standing to bring this suit. *See Resources Ltd. v. Robertson,* 35 F.3d 1300, 1302 (9th Cir.1994) (challenging Forest Service's issuance of the Flathead National Forest Land and Resource Management Plan (Plan) and the forest-wide Environmental Impact Statement (EIS) for failing to follow NEPA requirements); *Idaho Conservation League . v. Mumma,* 956 F.2d 1508 (9th Cir.1992) (alleging procedural failure in the Environmental Impact Statement in violation of the National Environmental Policy Act (NEPA)); *Fund for Animals v. Lujan,* 962 F.2d 1391, 1394 (9th Cir.1992) (alleging violation of NEPA and the Montana Environmental Policy Act by failing to prepare an environmental impact statement before adopting a plan to kill bison that leave Yellowstone National Park); *Alaska Fish & Wildlife Federation and Outdoor Council v. Dunkle,* 829 F.2d 933, 934–35 (9th Cir.1987), *cert. denied,* 485 U.S. 988, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988) (action claiming Fish & Wildlife Service failed to follow federal procedures before entering into an agreement regarding the hunting of migratory birds); *Sierra Club v. Department of the Interior,* 398 F.Supp. 284, 285–86 (N.D.Cal.1975) (alleging Secretary of the Interior failed to satisfy his statutory and fiduciary duty to protect the affected lands from the surrounding logging operations). Although these cases generally involve plaintiffs who claim an injury to their use and enjoyment of the affected lands, all of these cases involve challenges to the government's compliance with environmental statutes, and none a challenge to the equal value determination.

On the other hand, Defendants cite case law supporting the position that when the challenge is to an agency's equal value determination, plaintiffs, like those in the instant case, lack standing. *See Baca v. King,* 92 F.3d 1031, 1037 (10th Cir.1996) (grazing lessee had no standing to challenge equal value determination underlying land exchange); *Northern Plains Resource Council v. Lujan,* 874 F.2d 661, 668 (9th Cir.1989) (holding that Plaintiffs "lack standing. to appeal the [BLM's] equal valuation determination); *Lodge Tower Condominium Ass'n v. Lodge Properties, Inc.,* 880 F.Supp. 1370, 1381 (D.Colo.1995), *aff'd,* 85 F.3d 476 (10th Cir. 1996) ("Plaintiffs do not have standing to challenge the agency's equal value determination" because there was no causal connection between the injury alleged and the purported undervaluation.).

■ In the instant case, Plaintiffs challenge the BLM's alleged failure to comply with the FLPMA's equal value provisions. Plaintiffs' principal alleged injury is that their members will be unable to enjoy the selected and surrounding lands. This does not provide Plaintiffs with standing. As the applicable cases demonstrate, there is no causal connection between Plaintiffs' alleged injuries and the BLM's undervaluation. Although Plaintiffs may be able to assert this type of injury to challenge alleged noncompliance with environmental statutes or regulations, this same injury is insufficient to sustain a cause of action aimed at the manner in which the BLM has valued exchanged lands. As Gold Fields notes in its papers, "[p]ut . simply, any loss in Plaintiff's [sic] enjoyment of those lands would be precisely the same whether they were valued at $1 or $1 million per acre...."

Plaintiffs allege an environmental injury, yet challenge the BLM's compliance with a non-environmental statute. Essentially, they are attempting to satisfy the standing requirements through the "back door" by relying on case law that recognizes standing based on the same injury that they claim, but challenges an entirely different aspect of the law. Their attempt to establish standing in this manner is unavailing.

■ Plaintiffs additionally allege that because the selected lands were undervalued, the BLM is receiving less private land than it would if the BLM properly calculated the market value of the land. This allegation does not meet the standing requirements either. First, Plaintiffs' interest in any additional lands is not distinguishable from that of the general public. As was addressed by the Ninth Circuit in *Northern Plains,* "[m]erely alleging injury to their status as taxpayers (i.e., fewer federal funds from the

coal development would result in higher taxes for appellants) does not confer standing because it does not create an interest in favor of appellants distinguishable from that of the general public." *Northern Plains,* 874 F.2d at 669. Similarly in this case, Plaintiffs are alleging a general interest common to all members of the public in that they claim that the federal land being exchanged was not properly valued and thus the government is not receiving as much land as it would with a proper valuation. Essentially, Plaintiffs are attacking the way the government is spending its money, and this is insufficient to confer standing on them. *See id.* at 668.

Second, Plaintiffs' alleged loss of additional private inholdings cannot confer standing because it is speculative and not redressable by this Court. An order setting aside the BLM's equal value determination would not ensure access to any additional land. It is purely speculative to assume that an order by this Court would lead to the acquisition of more land. In fact, the process by which lands are exchanged is committed by statute to the BLM and the proponent of the exchange, not the judiciary. *See Baca v. King,* 92 F.3d 1031, 1037 (10th Cir.1996) (lack of standing to challenge equal value determination based in part on fact that court could not order BLM to issue a new grazing lease to Plaintiff). Plaintiffs' alleged injury in loss of additional in holdings is too speculative to satisfy the redressability requirement and therefore insufficient to establish standing.

Based upon the above analysis, this Court holds that Plaintiffs do not have standing to attack the BLM's equal value determination, and thus do not have standing to bring this motion for preliminary injunction or this action. This action must therefore be dismissed; however, because the Court urged the parties at the oral hearing to focus on the merits of the motion rather than the procedural issue of standing, the Court additionally addresses in the alternative, the merits of Plaintiffs' motion for preliminary injunction.

## C. Preliminary Injunction Analysis

### 1. Reasonable likelihood of success on the merits

As discussed above, Plaintiffs claim that the BLM's ROD is arbitrary, capricious and an abuse of discretion and thus this Court must "hold unlawful and set aside" the BLM's approval of the land exchange as required under Section 10(e) of the APA. Plaintiffs make two major attacks on the BLM's decision to approve the exchange. First, Plaintiffs claim that the agency's failure to consider the possibility that the selected lands could be most valuable for use as a landfill when determining the highest and best use of the selected lands and hence their market values was arbitrary and capricious. Secondly, the Plaintiffs challenge as arbitrary and capricious the failure of the BLM to consider whether the appraisal of the selected lands should be updated given the fact the appraisal of the selected lands was prepared in August 1994 and BLM's approval did not come until February 1996.

To apply the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A) involves a judicial weighing of the federal agency's action on its merits. In *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983), the Supreme Court noted:

> [It] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

This standard necessitates a judicial examination of the disputed decision's rationale and surrounding circumstances in order to carry out the "demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'" *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401

U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)).

■ The BLM decision is entitled to substantial deference and must be upheld if it rests on a rational basis. *See Hopi Tribe v. Navajo Tribe,* 46 F.3d 908, 914 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995) ("The standard is narrow and a court is not to substitute its judgment for that of the agency."); *Nevada Land Action Ass'n v. United States Forest Service,* 8 F.3d 713, 717 (9th Cir.1993) ("An agency's interpretation of its own regulations controls unless it is 'plainly erroneous.' "); *see also Northern Plains Resource Council v. Lujan,* 874 F.2d 661, 665 (9th Cir.1989) ("[W]here the review involves the interpretation of a regulation, the agency's interpretation of its own regulation is to be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.").

In order to determine whether the BLM's act of approving the land exchange was arbitrary, capricious and an abuse of discretion, it is necessary to outline the applicable regulations that the BLM is required to comply with when approving such a land exchange. The Court must then look at the information available to the BLM at the time it made its decision and determine if based on this information and the surrounding circumstances, BLM's decision to approve the land exchange was arbitrary and capricious or in excess of its authority.

43 C.F.R. § 2200.0–4 provides that the Director of the BLM has the responsibility of carrying out the functions of the Secretary of the Interior under these regulations. One of the main requirements in order for a land exchange to be valid is that the lands or interests to be exchanged shall be of equal value or equalized in accordance with the method set forth in 2201.6 of this part [cash equalization]. An exchange of land or interest shall be based on market value as determined by the Secretary through appraisal(s), through bargaining based on appraisal(s), or through arbitration. 43 C.F.R. § 2200.0–6(c). The main crux of the dispute in this action is whether the BLM's market value determination of the selected lands (obtained through reliance on the Nichols & Gaston appraisal) on which the BLM based its finding that the exchange was for equal value was arbitrary and capricious. To resolve this dispute, the Court must determine if the appraisal and subsequent appraisal report conformed to the requirements set forth in the regulations.

**Appraisals**

Section 206(d) of the FLPMA directs the Secretary to obtain and consider an appraisal of the affected lands' market value. The BLM commissioned an appraisal of the exchange lands in accordance with this section and to ensure that the lands were of equal value as required by Section 206. This appraisal was conducted by Nichols & Gaston, a firm recommended by BLM because its principal, John Nichols had almost 40 years of experience appraising property in California and clearly satisfied the appraiser qualification criteria set forth in the regulations.[2] The appraisal of the selected lands and one of the private parcels is dated June 22, 1994. A second appraisal of four of the private parcels is dated August 1, 1994.

Appraisals prepared for exchange purposes must contain certain information in order to comply with the regulations.[3] Most

---

**2.** Plaintiffs do not dispute the qualifications of Mr. Nichols and therefore this aspect need not be discussed. Additionally, the land exchange and the proposed landfill project were subjected to other governmental review processes that are not at issue in the instant action. For example, the BLM prepared an EIS as required by NEPA, as well as a biological opinion as required by the Endangered Species Act. To comply with the California Environmental Quality Act (CEQA), Imperial County conducted an extensive environmental impact analysis of the project which was approved by all seven incorporated cities within Imperial County.

**3.** Once the appraisal is prepared, it must then be independently reviewed by a qualified review appraiser. In reviewing the appraisal report, the review appraiser must determine if the appraisal report:
  (1) Is complete, logical, consistent, and supported by a market analysis;
  (2) Complies with the standards prescribed in § 2201.3–3; and
  (3) Reasonably estimates the probable market value of the lands appraised.
*See 43 C.F.R. § 2201.3–4.*
  Once the review is completed, the review appraiser must prepare a written review report

importantly in this case, the regulations require that the appraisal contain:

(1) an analysis of highest and best use (which is defined in the regulations and set out in footnote 1). § 2201.3–3(d);

(2) A description of comparable sales, including a description of all relevant physical, legal and economic factors.... § 2201.3–3(g); and

(3) An estimate of market value (also defined in the regulations and set out in footnote 1).

In estimating the market value of the land, the regulations further require that the appraiser:

(1) Determine the highest and best use of the property to be appraised. § 2201.3–2(a)(1); and

(2) Estimate the value of the lands and interest as if in private ownership and available for sale in the open market. § 2201.3–2(a)(2).

The focal point of Plaintiffs' claim is the BLM's determination of highest and best use. Two principles are key to proper determination of the highest and best use. First, the highest and best use is determined *at the time* of the appraisal. *See* BLM Manual 9310. Highest and best use is similarly defined in the BLM regulations as "the most probable legal use of a property, based on market evidence *as of the date of valuation.*" 43 C.F.R. § 2200.0–5(k) (emphasis added). Second, the appraiser must consider whether the use is "physically possible, legally permissible, financially feasible, and results in the highest value." *See Uniform Appraisal Standards* at 73.

Nichols & Gaston analyzed the highest and best use of the lands and found that at the time of the appraisal "the subject lands ... are considered to have a highest and best use for utilization in conjunction with the current mining operation of Gold Fields Mesquite Mine." June Appraisal, at p. 43. In deter-

mining the highest and best use, the appraisal report includes a definition of "highest and best use" which closely parallels the definition provided in the regulations.

■ Plaintiffs, however, contend that the appraiser's failure to address the possibility that a landfill could be physically possible, legally permissible and financially feasible renders it fatally flawed and in turn makes the BLM's reliance on the appraisal arbitrary and capricious. This Court finds that the failure of the appraisal to expressly consider a landfill as the highest and best use does not render the appraisal or the BLM's reliance thereon fatally flawed. Based on the evidence presented in the papers and at the hearing, the Court concludes that there was no general market for use of the land as a landfill. This conclusion is evidenced by the fact that Gold Fields owns the private land which is adjacent to and surrounds the selected lands and which forms the bulk of the Project. In order to successfully construct a landfill on the selected lands, any other private party would have to purchase at least a portion of Gold Fields' land. Additionally, a landfill located on the selected lands is a high risk venture that requires years of pre-development permitting procedures. In fact, as the recent judgment in the state court action involving this property and the Project indicates, a landfill may not be physically feasible due to compliance problems with the California Environmental Quality Act (CEQA). In sum, the appraisal was not flawed by its failure to mention the use of the selected lands as a landfill because there was no market for this type of use. The appraiser, as well as the BLM, were under no obligation to consider and discredit unmeritorious uses, they needed only to consider those uses that are legally, physically, and financially feasible, and a landfill does not fall within that definition.

---

containing certain information, including the following:

(1) A description of the review procedures used;

(2) An explanation of the adequacy, relevance, and reasonableness of the data and methods used by the appraiser to estimate value; and

(3) The reviewing appraiser's statements of conclusions regarding the appraiser's estimate of market value.

*See id.*

■ Moreover, although Plaintiffs' interpretation of what the highest and best use for the selected lands should have been differs from the decision reached in the appraisal and adopted by the BLM, this does not automatically render the BLM's decision arbitrary and capricious. As stated above, if the BLM's decision rests on a rational basis then it should not be disturbed. A review of the BLM's appraisal analysis would support the conclusion that their equal value determination and approval of the exchange were rationally based. The Nichols & Gaston appraisal consists of over 200 pages of analysis, discussion and tabular data, including a valuation of highest and best use of the selected lands. This appraisal was approved by two Chief State Appraisers, one of whom, Mr. Horyza, independently analyzed the highest and best use; discussed what uses were physically, legally, and financially permissible; and concluded that the selected lands were best valued for mine support purposes. Moreover, during the administrative appeal stage, the Interior Board of Land Appeals (IBLA) evaluated the administrative record before it and concluded that the "appellants' [Plaintiffs'] allegations of error and inadequacy in the appraisal are without foundation in fact or law and must be rejected." 137 IBLA 51. The allegations referred to by the IBLA include, among others, the same allegations that Plaintiffs use to support the instant motion.

Furthermore, the BLM appraisal also complied with the other elements of the regulations as set out above. The appraisal estimated the value of the land using a sales comparison method and fully explained why other valuation methods were not proper. It compared the exchanged lands to a significant number of other sales using a variety of factors including size of the site, water amenities, availability of utilities, and motivational differences in buyers. The appraisal was then reviewed and accepted by two BLM Chief State Appraisers. The appraisal reviews were embodied into appraisal reports that conformed with the applicable regula-

tions. The BLM's State Appraiser, Mr. Horyza, again analyzed the selected lands highest and best use, including those uses which were "legally, physically, and financially feasible." A subsequent review of the appraisal's valuation of the offered private lands resulted in an increase in the amount of land received by BLM in the proposed exchange. Based on the above analysis, the Court concludes that the BLM's methodology in determining the market value of the selected lands was reasonable and not arbitrary or capricious.

Plaintiffs base their second claim that the BLM's equal value determination was arbitrary and capricious on the fact that the Nichols & Gaston appraisal of the selected lands was conducted in June 1994 but the ROD was not issued until February 1996, and therefore, the BLM should not have relied on the allegedly outdated appraisals. To support this contention, Plaintiffs cite to a Draft BLM Manual which provides that an appraisal is presumed to be valid for a period of six months. The manual also provides, however, that the shelf life of an appraisal is an administrative agency determination and may vary by state or individual circumstances.

■ In this case, Nichols & Gaston appraised the lands in June and August 1994; Chief State Appraiser John Horyza modified the appraisal reports and explained in detail his appraisal review on October 14, 1994; and on June 2, 1995, Acting Chief State Appraiser Reynolds reviewed the appraisal reports and the modifications by Horyza, approved them, and declared the valuations valid for a period of one year unless the market showed significant changes before that time. The ROD was signed within that one-year period and Plaintiffs have not demonstrated any "significant changes" in the seven months between Mr. Reynolds' determination and the execution of the ROD.[4] Further, the IBLA previously addressed this very issue and concluded that:

4. In their supporting papers, Plaintiffs claim that Mr. Reynolds' June 1995 report that established the one year shelf life applied only to the appraised value of the private offered lands. As to

the selected lands [Federal], Plaintiffs contend that no exception to the six month presumptive shelf life was set.

Under these circumstances, appellants must show that the agency found in error that the appraisal reports continued to be a valid guide to valuation of the exchanged land. To do so would require some showing that there had been a change in the market that escaped the notice of BLM's appraisers during their review of the reports. No such showing having been made, the argument that the reports were unusable because they were too old must be rejected.

137 IBLA 50.

For these same reasons, the Court finds that the shelf life of the appraisals does not render the BLM's equal value determination and approval of the land exchange arbitrary, capricious or an abuse of discretion. Additionally, as there is no regulation that sets a mandatory shelf life for appraisals, the BLM did not act in excess of its statutory authority.

For the reasons discussed above and for purposes of this preliminary injunction motion, the Court holds that Plaintiffs have not demonstrated a probability of success on the merits and thus without a very strong showing of irreparable injury, a preliminary injunction would not be proper.

## 2. Irreparable harm

■ Plaintiffs have failed to prove that they would suffer irreparable injury if the Court denied their motion for a preliminary injunction. First, construction on the Project has been halted by a state court order. Second, this case could be tried relatively quickly to prevent any undue prejudice to either side. Third, even if the land exchange transaction were completed before a final resolution of the instant case, the Court has the power to unwind the deal if Plaintiffs are ultimately successful in invalidating the proposed exchange. Lastly, Plaintiffs' allegation that if the land were properly valued, the BLM would possibly acquire additional private land in the exchange is extremely speculative [5] and at best would only give rise to an incremental injury to Plaintiffs, if any.

5. A number of outcomes are possible, including abandonment.

Plaintiffs have failed to make the requisite showing of irreparable injury.

## 3. Balancing the Harm and the Public Interest

■ In considering the balancing of harms and the public interest, the balance tips sharply in favor of the Defendants and Intervenors. Defendants have successfully proven that the Project and land exchange present a significant benefit to the public. A significant source of revenue and employment opportunities would be delayed to Imperial County if the Court were to issue an injunction. In addition, an environmentally safe landfill will serve the needs of millions in Southern California, as well as produce millions of dollars in host fees, taxes, and wages in Imperial County. The exchange also has a positive impact on the environment by improving the biological integrity of the threatened desert tortoise population. BLM stands to acquire 3,656.1 acres of Category I Desert Tortoise Habitat to compensate for the loss of Category III Desert Tortoise Habitat (lower quality) within the Mesquite Regional Landfill Project. This environmental benefit (and burden if the injunction were granted) further supports a finding that the balance of harms weighs in favor of the Defendants and against a finding that a preliminary injunction is proper in this case. Taking all of the factors (likelihood of success, irreparable harm, balance of the harms, and the public interest) into consideration, this Court in the alternative would DENY Plaintiffs' motion for a preliminary injunction if it should be held on appellate review that Plaintiffs have sufficient standing to support jurisdiction.

## III. CONCLUSION

For the reasons stated above, the Court hereby:

(1) DISMISSES the instant action because Plaintiffs do not have standing, which in turn deprives the Court of jurisdiction over this action; and

(2) In the alternative only, DENIES Plaintiffs' motion for preliminary injunction

based on the Court's conclusion that even if Plaintiffs satisfied the standing requirements, a preliminary injunction is not proper because their claim has a very low probability of success on the merits, they have failed to show irreparable injury, and the balancing of harms tips sharply in favor of the Defendants.

IT IS SO ORDERED, ADJUDGED AND DECREED that JUDGMENT OF DISMISSAL WITH PREJUDICE BE ENTERED AGAINST PLAINTIFFS AND IN FAVOR OF DEFENDANTS.