**PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC.; Friends of the Earth New Jersey Department of Environmental Protection, Intervenor–Plaintiff,**

v.

**MAGNESIUM ELEKTRON, INC., Appellant.**

No. 96–5049.

United States Court of Appeals, Third Circuit.

Argued Nov. 12, 1996.

Decided Aug. 5, 1997.

Bruce J. Terris (argued), Monica Wagner, Terris, Pravlik & Wagner, Washington, DC, for Appellees Public Interest Research Group of New Jersey, Inc. and Friends of the Earth.

Lawrence A. Salibra, II, (argued), John C. Tillman, Alcan Aluminum Corporation, Mayfield Heights, OH, for Appellant Magnesium Elektron.

George M. Moscarino, Arter & Hadden, Cleveland, OH, for Amicus appellants Arizona Association of Industries; California Manufacturers' Association; Delaware State Chamber of Commerce; Illinois Manufacturers' Association; Indiana Manufacturers Association; Associated Industries of Missouri; Business Council of New York State, Inc.; Pennsylvania Manufacturers' Association; and Wisconsin Manufacturers & Commerce.

Daniel J. Popeo, Paul D. Kamenar, Washington Legal Foundation, Washington, DC for Amicus–Appellant Washington Legal Foundation.

Before: ALITO, ROTH and LEWIS, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge:

Pursuant to the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a), Public Interest Research Group (PIRG) and Friends of the Earth (FOE) have sued Magnesium Elektron, Inc. (MEI) for violating the terms of its National Pollution Discharge Elimination System (NPDES) permit. PIRG and FOE obtained a declaratory judgment from a New Jersey District Court establishing that they had standing to prosecute their action against MEI. *See PIRG v. MEI,* 34 ERC 2077, 1992 WL 16314 (D.N.J. 1992) (hereinafter *MEI I*). This Court affirmed the district court without written opinion, 983 F.2d 1052 (3d Cir.1992). At the penalty phase of the litigation, the district court then found that MEI's permit violations had caused no harm and posed no threat to the Wickecheoke Creek, the waterway into which MEI discharged its effluent. *See PIRG v. MEI,* No. 89–3193, 1995 WL 461252 (D.N.J. March 9, 1995) (hereinafter *MEI II*). In response to these findings, MEI has asked this Court to revisit the district court's original decision on standing. For reasons explained below, we will reverse the district court and vacate its permanent injunction and judgment against MEI.

### I.

In 1972, Congress enacted the Federal Water Pollution Control Act ("Clean Water Act") to restore and maintain the nation's waters and to eliminate the discharge of pollutants into waterways by 1985. *See* 33 U.S.C. § 1251(a)(1). Congress enlisted the help of the public in attaining this goal by authorizing citizens to bring suits against those who violated the Act. *See* 33 U.S.C. § 1365.[1] Accordingly, "citizen suits supplement government efforts" to enforce the Act. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn,* 913 F.2d 64, 74 (3d Cir.1990). Under the Act, corporations

---

1. Section 1365 states in pertinent part,

(a) Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf—

(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation. ... 33 U.S.C. § 1365 (1986).

may not discharge pollutants into navigable waterways, *see* 33 U.S.C. § 1311(a), unless they obtain a National Pollution Discharge Elimination System (NPDES) permit. *See* 33 U.S.C. § 1342. Compliance with the terms and conditions of the permit constitutes compliance with the Act. *See* 33 U.S.C. § 1342(k). The permits, in turn, place limitations on the amount of effluent (pollution) corporations may discharge into the water, and require permit-holders to monitor their effluent discharges, to file test results and other data with the Environmental Protection Agency, and to cooperate with state agencies by placing the information on Discharge Monitoring Reports (DMR's). *See* 40 C.F.R. §§ 122.41(j) and 122.48 (1989).

MEI manufactures zirconium carbonate, a chemical used in paint and other products. In 1976, the EPA issued MEI a permit authorizing it to discharge certain pollutants into the Wickecheoke Creek. The Creek flows into the Delaware River and Raritan Canal approximately 8.5 miles downstream from MEI's discharge point. *See MEI II*, at 9–10. MEI does not dispute that PIRG's members use the River and Canal for fishing and recreational purposes. The 1976 permit set forth discharge limitations (effluent limitations) and monitoring and reporting requirements. The EPA delegated administration of the permit program to the New Jersey Department of Environmental Protection (NJDEP). NJDEP issued MEI another permit in 1984, authorizing the discharge of certain pollutants into the Creek. The 1984 permit expired on November 30, 1989. Because no new permit was issued, the terms of the 1984 permit remained in effect.

Public Interest Research Group of New Jersey and Friends of the Earth are non-profit environmental organizations.[2] Pursuant to the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365, PIRG and FOE brought suit against MEI in 1989 for violating the terms of its NPDES permit. According to PIRG and FOE, MEI had violated its

permit by exceeding the effluent limitations for certain pollutants and by failing to comply with the permit's monitoring and reporting requirements. The bulk of the alleged discharge violations concerned excess emissions of salt and total organic carbon (TOC), as well as temperature excursions, caused by MEI's discharge of heated wastewater into the Creek.[3]

In support of its motion for a declaratory judgment that it had standing, PIRG submitted affidavits from four of its members. *See Appendix*, at 861–873. Although the four affidavits differ somewhat in content, they all state the following:

1. The affiants engage in various recreational activities along the Delaware River and Raritan Canal, including hiking, walking, "studying nature," swimming and fishing. *See e.g. Appendix*, at 861¶ 3.

2. The affiants' enjoyment of these activities is lessened to the extent that they "know" the Delaware River "contains pollution." *Id.*

3. One affiant (Sandra Silverstone) avoids eating fish caught in the Delaware River because "I am concerned that those fish might be contaminated with harmful pollutants." *Appendix*, at 861–62 ¶ 4.

4. Another affiant (Julie Howat) avoids drinking water taken "directly" from the Delaware River "because I am concerned that the water might be contaminated." *Appendix*, at 864 ¶ 4.

MEI stipulated to committing 123 permit violations. On January 23, 1992, the district court, in its first opinion, found MEI liable for an additional 27 violations for excess discharges of total organic carbon (TOC). The district court also permanently enjoined MEI from violating its NPDES permit and granted PIRG's motion for a declaratory judgment that plaintiffs had standing to bring their citizens suit. In its discussion of standing, the court cited the four affidavits submitted by PIRG's members as evidence of actual

---

2. Except where otherwise noted, we will refer collectively to the two organizations as "PIRG."

3. Although PIRG's complaint raised additional discharge violations (such as MEI's violation of

its permit's oil and grease limitations), the district court concluded that these violations were non-recurring and not serious. *See MEI II*, at 23–24.

injury and referred to reports stating that excess TOC ordinarily depletes the amount of oxygen in water and thereby harms aquatic life dependent on oxygen. *See MEI I*, at 14–15. We affirmed the district court's decision without opinion, *PIRG v. Magnesium Elektron, Inc.*, 983 F.2d 1052 (1992).

Following a hearing to determine penalties, the district court issued an opinion imposing $2.625 million dollars in penalties on MEI. *See PIRG v. Magnesium Elektron, Inc.*, 1995 WL 461252 (D.N.J. March 9, 1995) (*MEI II*). In this opinion, the district court credited the testimony of MEI's expert limnologist, Dr. Kathleen Keating, that MEI's discharge violations had caused no harm to the aquatic ecosystem of the Wickecheoke Creek and in fact, may have improved it by adding nutrients in which it was deficient. *See MEI II*, at 6–8 (discussing origin and contents of Keating's limnological study). Keating conducted her study of the Wickecheoke Creek between June 1979 and July 1981. In a pre-trial order, the two parties stipulated that Keating's findings regarding the impact of MEI's effluent violations on the Wickecheoke Creek would be the same in 1989 as it was when the Limnological Study was conducted, nearly a decade earlier. *See MEI II*, at 8.[4] Keating also submitted her conclusions in an affidavit to the court.

Although in *MEI I*, 34 ERC at 2086, the district court referred to Keating's affidavit as "conclusory," the court nevertheless eventually concluded that her findings of no injury or threat of injury to the Creek were persuasive. *See MEI II*, at 16–23.

In December 1995, the court issued a decision denying MEI's motion to reconsider its penalty determination and awarded plaintiffs $524,899.09 in attorneys fees and expenses. MEI now appeals the judgment of the district court, including its standing decision, in light of the district court's conclusions in *MEI II* that the discharge violations visited no harm on the Wickecheoke Creek.

4. In the Revised Final Pretrial Order (March 5, 1992), the parties stipulated the following:
"If the limnological study were conducted in 1989, the impact of the dissolved salts in MEI's

## II.

### A. *The Law of the Case*

■ Before we consider the merits of MEI's argument, we first must contend with PIRG's argument that, because an appellate court affirmed the district court's initial decision in *MEI I*, the law of the case precludes our reconsideration of the issue of standing. The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation. The doctrine applies "as much to the decisions of a coordinate court in the same case as to a court's own decisions." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988). Because it prevents courts from entertaining endless appeals on the same issue, the doctrine promotes finality and judicial economy. "Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 Charles A. Wright, Arthur R. Miller, Edward Cooper, *Federal Practice and Procedure* § 4478 at 788 (1981).

■ The law of the case doctrine does not limit a federal court's power; rather, it directs its exercise of discretion. *See Arizona v. California*, 460 U.S. 605, 619, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). The Supreme Court has elaborated on the scope and nature of this discretion:

A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'

*Christianson*, 486 U.S. at 817, 108 S.Ct. at 2178 (citation omitted). This Circuit has recognized several "extraordinary circumstances" that warrant a court's reconsidera-

effluent on the [organisms] in Wickecheoke Creek would be the same as it was when the limnological study was conducted." *Appendix*, at 744.

tion of an issue decided earlier in the course of litigation. They include situations in which: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice. *See Bridge v. U.S. Parole Commission*, 981 F.2d 97, 103 (3d Cir.1992); *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169–70 (3d Cir.1982).

■■■ MEI argues that this Court may revisit the standing issue because the district court's findings in *MEI II* undermine its decision in *MEI I* that PIRG had standing to pursue its case. We agree. It is well established that plaintiffs must show injury or at least an imminent threat of injury in order to maintain their standing in a federal court. *See e.g. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The district court's conclusion that MEI's pollution did not affect the Wickecheoke Creek's ecosystem casts much doubt on PIRG's claim that its members either have been suffering or will suffer injury.

■■■ When a district court issues findings that undermine an earlier conclusion that the plaintiffs before it have standing to sue, the court creates exactly that type of "extraordinary circumstance" that warrants reconsideration of the standing issue. Standing is a threshold jurisdictional requirement, derived from the "case or controversy" language of Article III of the Constitution. *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471–73, 102 S.Ct. 752, 757–59, 70 L.Ed.2d 700 (1982). Plaintiffs must have

standing at all stages of the litigation, *see National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), and they bear the burden of proving it "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136. In addition, federal appellate courts have a bedrock obligation to examine both their own subject matter jurisdiction and that of the district courts. *See FW/PBS Inc. v. City of Dallas*, 493 U.S. 215, 230–231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990). *See also Chabal v. Reagan*, 822 F.2d 349, 355 (3d Cir.1987) (speaking of "overarching principle that requires us continually to inquire into our own jurisdiction"). The Supreme Court has remarked that standing is "perhaps the most important" of jurisdictional doctrines. *FW/PBS Inc.*, 493 U.S. at 230, 110 S.Ct. at 607, *quoting Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). As a jurisdictional prerequisite, standing prevents the federal courts from becoming forums for the "ventilation of public grievances" and protects the delicate balance of power shared by the executive, legislature, and judiciary. *See Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759; *Allen*, 468 U.S. at 759, 104 S.Ct. at 3329. Therefore, PIRG cannot hide behind the law of the case.[5]

Moreover, we find no bar to our reconsideration of standing by the Supreme Court's holding in *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). In *Christianson*, the Federal Circuit had transferred a patent case to the Seventh Circuit because

5. The dissent argues that we should remand this case to the district court to afford PIRG the opportunity to submit further evidence supporting its claim that it has standing. We disagree. Regardless of whether MEI formally requested the district court's reconsideration of the standing issue, we must consider it on appeal. *See FW/PBS*, 493 U.S. at 230, 110 S.Ct. at 607. Like any jurisdictional requirement, standing cannot be waived. Therefore, throughout the entire litigation, it remained PIRG's responsibility to demonstrate that it had standing to pursue this case. Because we have failed to find standing, our proper course of action in this case is to reverse the lower court's standing determination and vacate its judgment in favor of PIRG. *See FW/PBS*,

493 U.S. at 235, 110 S.Ct. at 610 (vacating lower court's judgment and directing court to dismiss portion of action in which plaintiff lacked standing).

Not only is a remand improper in this case, but it is also entirely unnecessary. PIRG had a full opportunity at the penalty phase to meet its burden of proving harm. Moreover, PIRG has not come forward with any new facts that might prove standing. Indeed, at oral argument, PIRG premised its claim for standing on the law of the case and on the facts that were already in the record. The dissent's suggestion of what PIRG *might* prove if given the chance is entirely speculative.

the Federal Circuit thought that it lacked jurisdiction. Instead of hearing the case, the Seventh Circuit revisited the issue of jurisdiction and transferred the case back to the Federal Circuit. The Supreme Court put an end to such "jurisdictional ping-pong" when it held that a transferee court should not question the transferor court's decision that it lacked jurisdiction unless the transferor's decision was "clearly wrong." *Christianson,* 486 U.S. at 817, 108 S.Ct. at 2178. The Court understandably was concerned about interminable transfer litigation and its effects on the parties: "[T]ransferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation." *Id.,* 486 U.S. at 816, 108 S.Ct. at 2179. The Court then commented in a footnote, "There is no reason to apply law-of-case principles less rigorously to transfer decisions that implicate the transferee's jurisdiction. Perpetual litigation of any issue—jurisdictional or nonjurisdictional—delays, and therefore threatens to deny justice." *Id.* at 816 n. 5, 108 S.Ct. at 2178 n. 5.

Despite the Court's dicta in *Christianson,* we do not think the Supreme Court intended in one footnote to eviscerate, in all instances, the federal courts' prerogative to revisit important jurisdictional questions. Rather, we think *Christianson*'s commentary on the law of the case and jurisdiction applies only within the context of transfer cases. Transfer cases pose a special problem to litigants because the parties already must endure the process of moving between two different and often geographically distant courts. When transferee courts fail to follow the law of the case, they drive up the costs of litigation dramatically and allow parties to capitalize on jurisdictional uncertainty. We believe that the cost and correspondent threat of interminable litigation is weaker outside the transfer context. We trust that federal judges ordinarily can recognize the difference between a strategic ploy and an important jurisdictional matter that requires the court's reconsideration. Thus, we read *Christianson*'s discussion of the law of the case, as it relates to jurisdiction, to apply only to transfer cases and not to cases that raise serious jurisdictional concerns, such as the plaintiff's standing to sue.

We agree with PIRG that a court's revisitation of issues resolved earlier in the litigation is a serious matter and should not be taken lightly. For that reason, we do not abandon the three-pronged test we set forth in earlier opinions. *See e.g. Bridge,* 981 F.2d at 103; *Hayman Cash Register,* 669 F.2d at 169–170. We merely articulate the principle that courts may reconsider issues that impinge on their jurisdictional powers, as enumerated by Article III of the Constitution, when extraordinary circumstances warrant such reconsideration. In doing so, we recognize that two sister circuits have held that the law of the case doctrine applies to subject matter jurisdiction. *See LaShawn A. v. Barry,* 87 F.3d 1389 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997); *Ferreira v. Borja,* 93 F.3d 671 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 972, 136 L.Ed.2d 856 (1997). Nevertheless, we conclude that the concerns implicated by the issue of standing—the separation of powers and the limitation of this Court's power to hearing cases or controversies under Article III of the Constitution—trump the prudential goals of preserving judicial economy and finality. Consequently, we do not think the law of the case is applicable in this instance to prevent our reconsideration of standing, particularly in view of the fact that new evidence, Dr. Keating's testimony, was presented to the district court which had a direct bearing on the issue of standing.

Moreover, several post-*Christianson* cases support our determination that the law of the case need not be applied to all jurisdictional disputes. In *Baca v. King,* 92 F.3d 1031, 1034 (10th Cir.1996), the Tenth Circuit declared that the law of the case doctrine "is not a fixed rule that prevents a federal court from determining the question of its own subject matter jurisdiction in a given case." The Second Circuit has remarked that subject matter jurisdiction is "particularly suited" for reconsideration. *Di Laura v. Power Authority of the State of New York,* 982 F.2d 73, 77 (2d Cir.1992). In *Walsh v. McGee,* the district court for the Southern District of

New York reasoned, "[A] federal court cannot assert jurisdiction over a claim that is outside the scope of the court's jurisdiction merely by relying on the court's own prior decision that jurisdiction over such claim was proper." *Walsh,* 918 F.Supp. 107, 112 (S.D.N.Y.1996). In sum, other courts have recognized the principle that the federal courts' unyielding obligation to uphold statutory and constitutional limitations on jurisdiction should not bend to less important prudential notions of comity and finality. *Cf. United States v. Todd,* 920 F.2d 399, 403 (6th Cir.1990) (law of case doctrine is discretionary tool used by courts to promote judicial efficiency).

### B. *Standing*

■ The district court's finding in *MEI II* that MEI's emissions posed no threat to the Wickecheoke Creek cast much doubt on its initial decision regarding the plaintiffs' standing to litigate this case. Accordingly, we will reconsider the question of whether PIRG's members have standing to pursue this action. Standing is a legal issue. We exercise plenary review over the district court's determination that plaintiffs had standing to sue MEI. *Natural Resources Defense Council v. Texaco Refining & Marketing, Inc.,* 2 F.3d 493 (3d Cir.1993) (hereinafter *Texaco Refining*).

■ Standing comprises both jurisprudential and constitutional requirements. *See Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. Organizations may file suit on behalf of their members provided that: "(1) the organization's members would have standing to sue on their own, (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires individual participation of its members." *PIRG of New Jersey, Inc. v. Powell–Duffryn Terminals, Inc.,* 913 F.2d 64, 70 (3d Cir.1990); *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). MEI argues that PIRG lacks organizational standing because its members do not have standing to sue individually based on the facts of this case. MEI's counsel also contended at oral argument that PIRG and FOE lacked standing because their charters prohibit them from having members. We do not accept this formalistic argument because it lacks merit. To meet the requirements of organizational standing, PIRG and FOE need only prove that their members possess the "indicia of membership" in their organizations. *Hunt,* 432 U.S. at 344, 97 S.Ct. at 2442. Thus, in considering PIRG's standing, we will consider only if PIRG's members would have standing as individuals to sue MEI.

■ For an organization to have standing, a plaintiff-member must show: (1) injury in fact, an invasion of a legally protected interest which is concrete and particularized and actual or imminent; (2) a causal link between the defendant's conduct and the injury, such that the conduct is "fairly traceable" to that conduct; and (3) the likelihood that judicial relief will redress the plaintiff's injury. *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136. MEI argues that PIRG lacks standing because it is unable to meet the injury-in-fact requirement. PIRG responds with several arguments. For clarity, we have reorganized PIRG's arguments as they appear in its brief, and address each one separately.

### 1. *Congressional intent*

■ First, PIRG cites the general-purpose section of the Clean Water Act, which states that Congress' intention was, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Focussing on this language, PIRG reasons that organizations and individuals may sue to protect waterways even if the waterways have not yet been polluted."Even if the Delaware River and Delaware and Raritan Canal were pristine, PIRG would have standing to sue in order to maintain that pristine state." *Appellees' Br.,* at 11.

■ PIRG's reasoning is faulty for two reasons. First, PIRG fails to recognize that Congress' power to authorize citizen suits and draft citizens as private attorneys general is inherently limited by the "case or controversy" clause of Article III of the Constitution. As the Fourth Circuit has observed,

"Congress' provision for citizens suits does not, in itself, establish Article III standing...." *Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109, 1113 (4th Cir.1988). Even if Congress intended that the Clean Water Act protect navigable waterways "in their pristine state," Congress could not create a private cause of action in the absence of actual or threatened injury.[6]

█ Moreover, we do not think the general purpose section of the Clean Water Act endows private citizens with the same enforcement powers as the EPA or coordinate state agencies. In *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court rejected a similar argument that the plaintiffs had standing to protect animals on the other side of the globe because the general purpose of the controlling statute was to protect contiguous ecosystems, regardless of how far away or infrequently visited. Writing for the Court, Justice Scalia declared:

> It makes no difference that the general-purpose section of the [Endangered Species Act] states that the Act was intended in part "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," 16 U.S.C. § 1531(b). To say that the Act protects ecosystems is not to say that the Act creates (if it were possible) rights of action in persons who have not been injured in fact, that is, persons who use portions of an ecosystem not perceptibly affected by the unlawful action in question.

*Lujan,* 504 U.S. at 566, 112 S.Ct. at 2139. In *Lujan,* the Supreme Court was concerned that the plaintiffs had no plausible connection to the situs of injury. Here, we have no doubt that PIRG's members use the Delaware River. On the other hand, we are less confident that MEI's discharges have or will cause any injury to that waterway. Just as the Supreme Court was unwilling to find that the Endangered Species Act created a cause of action to protect vaguely defined "ecosys-

tems," we are equally unwilling to hold that the Clean Water Act creates a cause of action to maintain waterways in their "pristine state" absent at least a plausible threat of imminent injury.

Thus, we believe that, to the extent that the Clean Water Act purports to maintain the integrity of the nation's waters, the Act does not authorize private causes of action against polluters absent some showing of injury or threat of injury.

### 2. *Knowledge of pollution*

█ Next, PIRG's members attempt to meet the injury requirement by stating in their affidavits that their enjoyment of the Delaware River and Raritan Canal is lessened to the extent they "know" that MEI pollutes the Wickecheoke Creek. *Appendix,* at 861 ¶ 3. These statements do not establish standing. PIRG's knowledge that MEI exceeded the effluent limits set by its NPDES permit does not, by itself, demonstrate injury or threat of injury.

The Supreme Court has repeatedly held that generalized grievances shared by the public at large do not provide individual plaintiffs with standing. *See e.g. Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760; *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975). PIRG's argument that its members are injured by the knowledge that MEI pollutes nearby waters is analogous to the injuries claimed by the plaintiffs in *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In *Allen,* the Supreme Court held that the parents of black children lacked standing to sue the federal government for the IRS' application of tax exemptions to racially discriminatory schools. First, the Court repeated the bedrock principle that the right to have the government act in accordance with the law was insufficient, by itself, to support standing. *Allen,* 468 U.S. at 754, 104 S.Ct. at 3326. The Court then explained why the stigmatic injury suffered

---

6. Of course, Congress may authorize the EPA with the power to maintain and enforce effluent limitations, regardless of whether the EPA can show injury or threat of injury. *See* 33 U.S.C. § 1319 (authorizing compliance orders, civil actions, criminal and civil penalties for those who violate effluent standards).

by the black children and their parents was not judicially cognizable:

> If the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school. All such persons could claim the same sort of abstract stigmatic injury respondents assert in their first claim of injury. A black person in Hawaii could challenge the grant of a tax exemption to a racially discriminatory school in Maine.

*Allen*, 468 U.S. at 755–56, 104 S.Ct. at 3327. The stigmatic injury in *Allen* is analogous to the knowledge-of-violation injury claimed here. The *knowledge* that a corporation has polluted waters is an "injury" suffered by the public generally. An environmentalist in Colorado or a botanist in California may feel just as strongly about MEI's violation of its discharge permit as do the plaintiffs in this case. Nevertheless, absent a showing of actual, tangible injury to the River or its immediate surroundings, PIRG's members are no less "concerned bystanders" than any other citizen who takes an interest in our environment. The legal"right" to have corporations obey environmental laws cannot, by itself, support standing. Therefore, PIRG's members must show more than "a mere exceedence of a permit limit" to prove a judicially cognizable injury. *See Powell Duffryn*, 913 F.2d at 72.

Significantly, PIRG's members do not allege in their complaint or affidavits any injury to the Delaware River. They have not cited any increases in the River's salinity, or a decrease in the number of fish, or any other negative change in the River's ecosystem. This case therefore is different from *Powell Duffryn*, where the plaintiffs complained of "the brown color and the bad odor" of the water in the Kill Van Kull, *see Powell Duffryn*, 913 F.2d at 71, or from the *Texaco Refining* case, where plaintiffs observed an "oily sheen" and an "unpleasant smell" near Texaco's refinery. *See Texaco Refining*, 2 F.3d at 505.

In this case, PIRG's members have shown only that they reduced certain of their recreational activities near the Delaware River. They have not shown that the River suffers from particular types of pollution. In *MEI I*, the district court credited this reduced activity as evidence of injury. *See MEI I*, 34 ERC at 2080. But the reduction in a person's recreational activity cannot support the injury prong of standing when a court also concludes that a polluter's violation of an effluent standard has not harmed the affected waterway and that it, in fact, poses no threat to that waterway.

PIRG supported its motion for standing by indicating the generic harm *usually* caused by the types of effluents released by MEI. In *MEI I*, the district court apparently accepted this information in lieu of any allegation or proof that the area used by plaintiffs had actually been harmed or was likely to be harmed in the imminent future. *See MEI I*, 34 ERC at 2080 ("Plaintiffs provide reports which state that excess Total Organic Carbon ("TOC") depletes the amount of dissolved oxygen in the water, which in turn affects the survival of fish and other aquatic life"). PIRG now argues that generic statements of harm by themselves support standing and cites *Powell Duffryn* for this point. PIRG misconstrues *Powell Duffryn*. In that case, we were concerned with the causation prong of the standing doctrine. Recognizing that a combination of pollutants from divergent sources could result in pollution, we held that plaintiffs need only show a "substantial likelihood" that defendants had caused their injury and stated that plaintiffs could establish such likelihood by showing that:

> a defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that (3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.

*Powell Duffryn*, 913 F.2d at 72. This test in no way replaces the three-prong test for standing under Article III of the Constitution. It merely enables a plaintiff to link an environmental injury to the defendant's pol-

lution when the plaintiff is unable to prove "to a scientific certainty" that the defendant's discharges (and not those of some other nearby polluter) caused that injury. *See also Texaco Refining*, 2 F.3d at 505. Our decision in *Powell Duffryn* does not and could not stand for the principle that generic claims of harm, without more, satisfy the injury requirement for standing.

### 3. *Threat of injury*

Based on the facts before the district court, the only way PIRG could have met its injury requirement was to show that MEI's discharge violations posed a threat of injury to the members' recreational interests in the Delaware River and Raritan Canal.

■■■ PIRG relies on the language of the Clean Water Act in arguing that, to bring suit against MEI, its members need only show that they "may be adversely affected" by MEI's pollution. *See* 33 U.S.C. § 1365(g).[7] As we stated earlier, Congress can confer only so much power on citizens wishing to sue polluters who have violated their NPDES permit. Accordingly, we read the phrase "may be adversely affected" as inherently limited by the injury prong of the constitutional test for standing. Thus, *even if* PIRG's members can show that they "may be adversely affected" by MEI's pollution into the Wickecheoke Creek, they must also demonstrate that their threat of injury is imminent.

■■■■ When a plaintiff claims that a defendant's threatened injury is the source of his standing, he must show that the threat-

ened injury is so imminent as to be "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 155–58, 110 S.Ct. 1717, 1723–25, 109 L.Ed.2d 135. The imminence requirement ensures that courts do not entertain suits based on speculative or hypothetical harms. *See Lujan*, 504 U.S. at 564, 112 S.Ct. at 2138–39 n. 2. The district court could not reasonably have concluded that the threat of injury to the Delaware River was "certainly impending" once the court accepted MEI's evidence that its discharge violations posed no threat of harm whatsoever to the aquatic ecosystem of the Wickecheoke Creek, the point where MEI discharged its effluent into the water. Although evidence of generic harm might support standing in other contexts, it fails to support a claim of threatened injury once the defendant proves in the particular case before the court that those harms are unlikely.

The majority of MEI's discharge violations involved three types of effluent violations: temperature, sodium and total organic carbon (TOC).[8] In each case, following the penalty phase of the litigation, the district court found that the discharge violations visited no harmful effects on the aquatic ecosystem of the Wickecheoke Creek. *See MEI II*, at 16–23. PIRG does not dispute the district court's findings or conclusions. Rather, it argues that the district court's determination applies only to the Wickecheoke Creek, as opposed to the Delaware River. We think this distinction is specious.

MEI incurred temperature excursions by discharging heated wastewater into the Wickecheoke Creek. The purpose of the

---

7. 33 U.S.C. § 1365(g) states:

"For the purposes of this section, the term 'citizen' means a person or persons having an interest which is or may be adversely affected."

8. MEI also incurred two oil excursions more than four years prior to PIRG's commencement of this action. We reject the standing based on the oil excursions because MEI committed no prior or subsequent violations of this part of its permit and because the district court concluded, "There is no evidence of any harm to the environment or of any aesthetic problem as a result of the two isolated oil excursions." *MEI II*, at 24. Based on this finding, PIRG's members can neither show injury or threat of injury as a result of the oil excursions.

In addition, MEI incurred two "bypass" violations as a result of a onetime dredging operation and a restricted outlet line. The district court found that these violations never recurred and were not serious. *Id.* Accordingly, the bypass violations cannot support PIRG's standing to sue any more than the oil and grease violations.

Moreover, to the extent these violations were "wholly past" at the time PIRG brought suit against MEI, they cannot provide PIRG's members with statutory standing under the citizen suit provision of the Clean Water Act. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (holding that citizen plaintiffs lack standing to sue for wholly past violations of Clean Water Act under 33 U.S.C. § 1365).

temperature limitations in MEI's permit was to limit disruptions to the Creek's aquatic life. MEI's limnologist, Kathleen Keating, testified that MEI's temperature excursions did not threaten the Creek's ecosystem because of various dilution factors. In *MEI II*, the district court accepted this evaluation, as well as MEI's evidence that ambient (natural) temperatures "always prevailed notwithstanding the excursions," and concluded "the temperature excursions did not harm the ecosystem, even though they were frequent." *MEI II*, at 23. The Delaware River is eight miles downstream of the point where MEI discharges wastewater into the Wickecheoke Creek. The River could not possibly have been affected by the temperature of MEI's wastewater if ambient temperatures "always prevailed" in the Creek. Thus, PIRG could not show either injury or threat of injury to the Delaware River that resulted from MEI's temperature excursions.

MEI also violated its permit eighteen times by discharging too much sodium into the Creek. Theoretically, too much sodium could harm the aquatic ecosystems of the Creek, and presumably, ecosystems of the Delaware River. Based on Dr. Keating's study, however, the district court concluded in *MEI II* that the sodium excursions had "no negative effect on the ecosystem" of the Creek. *MEI II*, at 20. MEI argues that if the sodium excursions did not affect the Creek's aquatic life, they could not affect the River's ecosystem, some eight miles downstream of the discharge point. At oral argument, PIRG responded that the salt emitted by MEI in the Creek could combine with other sources of salt and thereby damage the River's aquatic life. Although this argument may be sound under some circumstances, it lacks any factual basis in the record before us. PIRG has not offered any evidence to date that the sodium levels of the Delaware River are at or beyond the point of saturation. Nor has PIRG offered any evidence that the aquatic life of the River has suffered from excess salinity or is somehow more vulnerable to MEI's sodium discharges than are those organisms that occupy the Creek. Based on the district court's finding in *MEI II*, we certainly cannot say that injury to the River's ecosystem was imminent or "certainly impending" as a result of MEI's sodium discharges.

MEI's third substantial permit violation concerned the elevated TOC levels in the Creek. Prior to dumping it in the Creek, MEI stored its wastewater in heated ponds. The ponds attracted migratory Canadian geese, whose feces raised the level of TOC in the water. TOC can deplete the amount of dissolved oxygen in water, causing fish and other aquatic organisms to die. In this case, however, the added TOC actually benefitted the Creek's ecosystem because the west branch of the creek was not nutrient rich. *See MEI II*, at 19. The district court concluded, "[t]here is no evidence of fish kills or other loss of aquatic life which depend upon sufficient quantities of dissolved oxygen for survival, or of aesthetic problems such as septic conditions and attendant malodorous emissions." *Id.* In fact, because the Creek was not nutrient rich, the TOC did not deplete the Creek's supply of dissolved oxygen, but rather, contributed to it. *Id.* If the TOC in this case benefitted the Wickecheoke Creek by adding nutrients and oxygen to its waters, we cannot understand how it could, at the same time, harm the Delaware River. PIRG's refrain that the Wickecheoke's water flows downstream to the Delaware River does not, by itself, demonstrate injury or imminent injury.

For the foregoing reasons, we conclude that PIRG and its members lacked standing to pursue their case against MEI for its violation of the emissions levels in its NPDES permit. Neither PIRG nor its members can show any actual injury or credible threat of injury to the Delaware River. Consequently, they lack standing.

### C. Monitoring and Reporting Violations

We turn now to MEI's final argument: that because PIRG lacks standing to pursue its claim against MEI for the discharge violations, it must also lack standing to pursue claims based on MEI's monitoring and reporting violations.

 The citizen suit provision of the Clean Water Act authorizes private citizens to commence civil actions against any person

who has violated either an effluent limitation or "an order issued by the Administrator or a State with respect to such a standard or limitation...." 33 U.S.C. § 1365(a)(1). Since MEI's monitoring and reporting obligations derive from the terms of its NPDES permit, PIRG's monitoring and reporting claims fall within the scope of the statute. *See Menzel v. County Utilities Corp.*, 712 F.2d 91, 94 (4th Cir.1983) (person who fails to file accurate discharge-monitoring reports violates terms of NPDES permit and is subject to citizen suit provision of Clean Water Act). Statutory authorization alone, however, does not provide standing. *See Simkins Industries*, 847 F.2d at 1113. PIRG's members must therefore show some threatened injury that can be traced to MEI's failure to monitor and report its effluent emissions accurately.

 Few courts have considered whether a plaintiff's standing to pursue a polluter's monitoring and reporting violations can exist absent standing to pursue that same polluter's discharge violations. In *Sierra Club v. Simkins Industries, Inc.*, the Fourth Circuit held that the Sierra Club had demonstrated injury or threat of injury from a permitholder's failure to monitor and report its discharge of harmful effluents into the Patapsco River, even though it was required to do so by its NPDES permit. *See Simkins Industries*, 847 F.2d at 1113. The suit concerned solely monitoring and reporting violations; the plaintiffs did not allege discharge violations. The Fourth Circuit concluded that standing existed because the defendant's failure to monitor and file proper reports hindered environmental planners and policymakers "who might undertake to remedy the effects of any pollution." *Id.* Implicit in this reasoning is the assumption that the defendant's effluent discharges posed a real threat to the environment. Such injury or threat of injury is not present in this case, as MEI has conclusively proven that its discharges posed no threat to the Wickecheoke Creek or PIRG's members. *Simkins Industries*

therefore does not guide our resolution of this issue.

In a case similar to the one before us, the Fifth Circuit held that "an individual without standing to sue for discharge violations, a fortiori, lacks standing to sue for reporting violations." *Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir.1996) (affirming lower court's dismissal of emissions claims and monitoring and reporting claims). Because we think that it is at least possible that some plaintiff in the future might allege a specific and concrete injury arising from a defendant's failure to monitor and report its effluent discharges, we will not adopt the Fifth Circuit's bright line rule.[9] Nevertheless, we must conclude, based on the facts in the record, that PIRG's members have failed to meet this requirement.

At oral argument, PIRG claimed that the information contained in the DMRs would enable it to enforce the Clean Water Act. Even if we assume that a decrease in one's ability to file a lawsuit satisfies the "injury" prong of standing, we still must conclude that PIRG lacked standing to pursue the monitoring and reporting claims because its "injury" was not redressable. Had MEI filed its DMRs correctly, PIRG's suit to enforce MEI's discharge limits in its NPDES permit would have been dismissed because the discharges failed to injure or cause any threat of injury to PIRG's members.

In their affidavits, PIRG's members also claim that MEI's failure to file accurate DMRs caused them to reduce their recreational use of the Delaware River. Although the "lack of information" argument might have some bite in other circumstances, it does not save the plaintiffs in this case. The pollutants MEI discharged into the Wickecheoke Creek do not cause the types of injury feared by PIRG's members. For example, one of the affidavits submitted by PIRG's members states: "[I]t is important for me to know how much pollution is in [the

---

**9.** For example, a plaintiff might have reason to fear the toxicity of fish in a river due to a defendant's past pollution of that river, which had resulted in injury to others. Were the defendant to then fail to monitor and report its ef-

fluent, the plaintiff might reasonably decide to forego eating fish from the river. Such a result might constitute the type of injury in fact necessary to support the plaintiff's standing to sue.

Delaware River] so I can decide whether to eat fish caught there." *See e.g. Appendix,* at 862 ¶ 5. Yet PIRG's members are unable to show that the effluents MEI discharges into the Wickecheoke Creek affect fish toxicity: salt, carbon and high temperatures might contribute to more fish kills, but they do not make the fish caught in the River more toxic or dangerous to eat. Similarly, another affiant claims that he is afraid to drink the water that is treated at a treatment plant near the Delaware River because he has high blood pressure and worries that the drinking water is too salty. *See Appendix,* at 868 ¶¶ 4, 5. Yet the affiant makes no attempt to show how MEI's salt excursions affect the level of salinity of the water that comes out of the *treatment plant.* Thus, even if MEI were to report all of its excursions faithfully, he still would lack information concerning the potability of his drinking water. Similarly, the other affiants would continue to lack information regarding the toxicity of fish from the Delaware River.

In sum, PIRG's members have shown that they are concerned about their surroundings. They have not shown, however, that MEI could reduce that concern by faithfully monitoring and reporting its discharges according to the terms of its permit. This, of course, is not to say that MEI is immune from liability for future violations of the monitoring and reporting requirements contained in its NPDES permit. Either the state of New Jersey or the EPA could bring an action against the company for failing to comply with the terms of its permit. *See* 33 U.S.C. § 1319. Nevertheless, under the facts of record in this case, PIRG's members lack standing to pursue MEI's monitoring and discharge violations.

### III.

Because we hold that PIRG lacked standing to pursue its claims against MEI, we will not address the district court's award of damages or its assessment of attorney fees. PIRG and FOE lacked standing to pursue either MEI's emissions violations or its monitoring and reporting violations under its NPDES permit. Accordingly, we will reverse the district court and vacate its judg-

ment in favor of the plaintiffs. We will also vacate the permanent injunction, since the district court lacked jurisdiction to enter it.

LEWIS, Circuit Judge, dissenting.

The district court originally found that PIRG had standing in *PIRG v. MEI,* 34 E.R.C.2077, 1992 WL 16314 (D.N.J.1992) (*"MEI I"*). We affirmed by judgment order in *PIRG v. MEI,* 983 F.2d 1052 (3d Cir.1992). The majority now correctly finds that findings of fact made in *PIRG v. MEI,* No. 89-3193 (D.N.J. March 9, 1995) (*"MEI II"*), undermine the original finding of standing. PIRG, however, was not on notice at any time between the affirmance of *MEI I* and the reversal of *MEI II* that standing remained a live issue. I believe that, given the opportunity, it is possible for PIRG to prove additional facts that would support standing. Because PIRG did not have an opportunity to prove such additional facts, I would remand. The majority, however, reverses, withholding from PIRG the opportunity to make its case. Thus, I respectfully dissent.

In *MEI I,* the district court found that the PIRG members had standing based on a number of injuries or threatened injuries that they suffered because of MEI's actions. These actions included MEI's unlawful discharge of sodium, oil and TOC. The majority notes that in *MEI II* the district court found that the discharges did not have a negative effect on the Creek. However, it fails to demonstrate that PIRG would be incapable of proving that its members had standing if the case were remanded.

While the majority identifies a number of issues that might be relevant to PIRG's standing, it declines to give PIRG the opportunity to address them. For instance, in response to PIRG's position, taken at oral argument, that the salt emitted by MEI could combine with other sources of salt and thus damage the Delaware River's aquatic life, the majority notes that

> [a]lthough this argument may be sound under some circumstances, it lacks any factual basis in the record before us. PIRG has not offered any evidence to date that the sodium levels of the Delaware River are at or beyond the point of satu-

ration. Nor has PIRG offered any evidence that the aquatic life of the River has suffered from excess salinity or is somehow more vulnerable to MEI's sodium discharges than are those organisms that occupy the Creek.

Majority Op. at 123. *See also* Majority Op. at 124 ("[T]he affiant makes no attempt to show how MEI's salt excursions affect the level of salinity of the water that comes out of the *treatment plant.* Thus, even if MEI were to report all of its excursions faithfully, he still would lack information concerning the potability of his drinking water. Similarly, the other affiants would continue to lack information regarding the toxicity of fish from the Delaware River.").

The majority also dismisses PIRG's argument that high TOC levels could have a negative impact on the Delaware River, noting that "[i]f the TOC in this case benefitted the Wickecheoke Creek by adding nutrients and oxygen to its waters, we cannot understand how it could, at the same time, harm the Delaware River." Majority Op. at 123.

Ultimately, the majority criticizes PIRG for not producing evidence to support standing, but PIRG was not on notice during the penalty phase of this litigation that standing remained a live issue. As there may be certain evidence that is relevant to prove standing, but not to prove damages, I would remand. On remand, PIRG could introduce evidence regarding the effect of increased salinity on the Delaware River and on the affiants. It could also attempt to explain how an increase in nutrients in a nutrient-poor portion of an ecosystem may have a negative impact on the remainder of a nutrient-rich ecosystem. Clearly, it is not for us to decide such fact-intensive issues.

As the Ninth Circuit noted in *Presbyterian Church v. U.S.,* 870 F.2d 518 (9th Cir.1989), a district court is in a better position than an appellate court to make findings of fact regarding standing. In that case, after finding that the allegations in a complaint provided an adequate foundation for standing, the court remanded to the district court to determine whether the allegations could be proved. It did this in spite of its suspicion that the "case should be dismissed on stand-

ing or mootness grounds." It concluded that it was, "as an appellate court, ill-equipped to decide these questions in the first instance." *Presbyterian Church,* 870 F.2d at 529.

PIRG's goal during the penalty phase was not to document particular harms to its members. Now that standing is again a live issue, it should be given the opportunity to do so. Given that PIRG might be able to prove facts sufficient to support its position, I am, like the *Presbyterian* court, "persuaded that the prudent course of action is to remand to the district court for further proceedings" regarding the basis of its standing. Id. at 528.