326 F.3d 505
 AMERICAN CANOE ASSOCIATION, INCORPORATED; Professional Paddlesports Association; The Conservation Council of North Carolina, Incorporated, Plaintiffs-Appellees, and
United States of America, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency, Plaintiff,
v.
MURPHY FARMS, INCORPORATED, d/b/a Murphy Family Farms; D.M. Farms of Rose Hill, Defendants-Appellants.
 No. 02-1501.
 United States Court of Appeals, Fourth Circuit.
 Argued: February 28, 2003.
 Decided: April 16, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED ARGUED: Richard Edward Schwartz, Crowell & Moring, L.L.P., Washington, D.C., for Appellants. Carolyn Smith Pravlik, Terris, Pravlik & Millian, L.L.P., Washington, D.C., for Appellees. ON BRIEF: Kirsten L. Nathanson, Crowell & Moring, L.L.P., Washington, D.C.; Jenna F. Butler, Ward & Smith, P.A., Wilmington, North Carolina; Reef C. Ivey, II, Ward & Smith, P.A., Raleigh, North Carolina, for Appellants. Bruce J. Terris, Terris, Pravlik & Millian, L.L.P., Washington, D.C., for Appellees.
 Before WIDENER and LUTTIG, Circuit Judges, and BEAM, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 Affirmed in part and vacated and remanded in part by published opinion. Judge LUTTIG wrote the opinion, in which Judge WIDENER and Senior Judge BEAM joined.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 The plaintiffs, turned appellees, are several organizations that share the common goal of maintenance of water quality in North Carolina's streams and rivers. These organizations brought suit against certain hog farms in North Carolina, alleging that these farms had violated the Clean Water Act ("CWA"), 33 U.S.C. § 1251, et seq., on several occasions by discharging swine waste into waters of the United States without a National Pollution Discharge Elimination System ("NPDES") permit. After years of litigation, the parties finally entered into a consent decree. The plaintiffs' participation in the consent decree was contingent on their success on two of the defendants' motions that were pending at that time. The pending motions challenged the district court's Article III jurisdiction and its jurisdiction under the citizen-suit provision of the CWA. The district court resolved both motions in favor of the plaintiffs and this appeal followed. We conclude that, although the district court erred in denying the defendants' standing motion, the court's decision on the merits of the standing issue was correct in light of all of the evidence before it, and accordingly we affirm. The district court failed, however, to make the requisite findings necessary to establish CWA jurisdiction. We vacate and remand on that issue to allow the district court to follow the appropriate procedures.
 
 I.
 
 2
 The present iteration of this case, much like the parties' prior appeal to this court, is largely concerned with procedural matters. Before explaining in detail the procedural posture of this case, we briefly describe the facts and allegations that form the basis of this lawsuit.
 
 
 3
 D.M. Farms of Rose Hill, L.L.C. and Murphy Farms, Inc. (collectively the "Farms" or "defendants") jointly operate sow farms in North Carolina. Five of the defendants' sow farms are involved in this case, the Magnolia 4, Melville 1 and 2, Dell, and Section 1 site 4 farms (collectively "Mag 4"). All five farms share a waste management system. The waste management system consists of lagoons, at least one for each farm, into which hog waste is flushed from the barns that house the animals. The waste and rainfall that accumulates in the lagoons is pumped through a piping system and sprayed onto the fields as fertilizer.
 
 
 4
 Before the commencement of this suit, the Farms operated under a North Carolina Department of Environment and Natural Resources ("DENR") Animal Waste Management Plan, which prohibited animal waste discharges to surface waters. As the Farms were regulated by DENR, they had not applied for a NPDES permit for the purpose of making discharges from Mag 4.
 
 
 5
 It is undisputed that on two occasions prior to the commencement of suit, while operating under the DENR Animal Waste Management Plan, there were unauthorized discharges of animal waste into waters of the United States from Mag 4 as a result of runoff from spraying the fields. The first identified discharge occurred on November 25, 1996. DENR discovered that wastewater from the Farms' fields was running into a tributary of Six Runs Creek.[1] In July 1997, the Farms once again discharged hog waste into a tributary of Six Runs Creek. Consistent with DENR's philosophy that an entity could correct the discharge problem in lieu of applying for a permit, at no time did DENR require the Farms to apply for an NPDES permit.
 
 
 6
 On January 16, 1998, the American Canoe Association, Incorporated, the Professional Paddlesports Association, and The Conservation Council of North Carolina, Incorporated (collectively "ACA" or "plaintiffs")[2] filed suit against the Farms under section 505(a) of the CWA, the citizen-suit provision. See 33 U.S.C. § 1365(a) (providing that "any citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation of ... an effluent standard or limitation under this chapter"). ACA first alleged that the Farms continuously violated the CWA by failing to obtain an NPDES permit after making unauthorized discharges. Second, ACA claimed that the Farms violated the CWA each time they discharged without such a permit. The Environmental Protection Agency later intervened as a plaintiff in the action.
 
 
 7
 On April 13, 1998, ACA moved for a declaratory judgment from the district court that they had standing to maintain the action. The parties briefed the issue and on September 2, 1998, the court issued what it styled a "Declaratory Judgment on Standing," in which it concluded that the plaintiffs had established standing.
 
 
 8
 ACA subsequently filed a motion for a preliminary injunction prohibiting the Farms from operating the MAG 4 facility in violation of the CWA and requiring the Farms to obtain an NPDES permit. Additionally, ACA filed a motion for partial summary judgment on their second claim, that the Farms violated the CWA when they discharged pollutants without an NPDES permit on at least two occasions. The Farms filed a motion for judgment dismissing ACA's first claim. The district court granted ACA's motion for a preliminary injunction on limited grounds, requiring only that the Farms formally apply to DENR for an NPDES permit for the MAG 4 facility. The district court also granted ACA's motion for partial summary judgment as to its second claim, and denied the Farms' motion for a judgment of dismissal on ACA's first claim.
 
 
 9
 The Farms appealed to the Fourth Circuit. Of importance to the instant appeal, both the Farms and ACA argued on appeal that the partial summary judgment ruling was appealable at that time. The Farms' theory was that pendent interlocutory appellate jurisdiction existed because the issues underlying the district court's grant of preliminary injunctive relief were bound up with the issues governing the plaintiffs' second claim for relief. See American Canoe Association, Inc. v. Murphy Farms, Inc., 2000 WL 328027, at *3 (4th Cir.) (unpublished) [hereinafter "Murphy Farms I"]. As this court described the Farms' argument, it was
 
 
 10
 that the district court's preliminary injunction must have been based upon a conclusion that there would be future discharges, because the district court necessarily found that ACA would be irreparably harmed absent the injunction; the only irreparable harm possible would be that from future discharges; and ACA, in order to prevail on its second claim, was required to prove that the alleged CWA violations were not wholly past violations ... and the district court held that ACA had sufficiently satisfied this burden to warrant partial summary judgment.
 
 
 11
 
 Id.
 
 
 
 12
 This court unequivocally rejected that argument. Said the court,
 
 
 13
 [t]he failure of this otherwise reasonable syllogism is in its premise, that the district court actually found a likelihood of future discharges. Nothing in the district court's order reflects that it made any finding as to the possibility of future discharge.
 
 
 14
 Id. (emphasis added). The court accordingly declined to review the Farms' appeal from the district court's grant of partial summary judgment on ACA's second claim and dismissed that portion of the appeal. As to the preliminary injunction issue, the court remanded the case for a mootness inquiry by the district court based on the possibility that changes in North Carolina's policy might require the Farms to apply for an NPDES permit. Id. at *4.[3]
 
 
 15
 On remand, the parties entered into a Consent Decree, which effectively settled the merits of the action. At that time, however, there were pending certain outstanding motions in the district court. The parties decided to enter into a Consent Order and Protocol (the "Consent Order") so that resolution of the outstanding issues would not delay implementation of the remedies provided for in the Consent Decree. Of relevance to this appeal, the Consent Order generally prohibited further litigation of the case. However, the Consent Order made ACA's participation in the Consent Decree contingent upon its success on two outstanding motions of the Farms. The first was a March 6, 2001, Motion for Reconsideration of Declaratory Judgment on Standing (the "Standing Motion"). In that motion, the Farms sought to convince the district court to revisit, and overturn, its earlier declaratory judgment on standing based on "new evidence" that the Farms had adduced.[4] The second outstanding motion described in the Consent Order was a March 5, 2001, Motion for Summary Judgment against Citizen Plaintiffs under the Gwaltney Test (the "Gwaltney Motion").[5]
 
 
 16
 On April 2, 2002, the district court denied both of the Farms' motions. With respect to the Standing Motion, the district court reasoned first that the Farms had failed to show that the new evidence they sought to introduce was not previously available. Alternatively, even considering the new evidence, the district court concluded that, under Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), and this court's decision in Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149 (4th Cir.2000) (en banc), a failure to show environmental impact is not dispositive of the question whether there has been injury to the plaintiff sufficient to support standing. Thus, the Farms' new evidence, which addressed environmental impact, did not call into question the court's earlier judgment. The district court apparently treated the defendants' Gwaltney Motion as, in effect, a motion for reconsideration of its December 22, 1998 order. In that order, which awarded partial summary judgment to the plaintiffs on their second claim, the district court concluded that "[t]he defendants' argument[ ]... that the claim is based on past events... [is] unavailing." J.A. 1255. The district court chided the Farms for attempting to resurrect an argument that it had already rejected and it denied the Farms' Gwaltney Motion.
 
 
 17
 After denying both motions, the district court proceeded to enter final judgment pursuant to the Consent Order. On May 17, 2002, the court directed the clerk to enter a judgment providing, among other things,
 
 
 18
 [t]hat this court has jurisdiction over the plaintiffs' citizen suit regarding the defendants' violations of the Clean Water Act....
 
 
 19
 J.A. 1759. On May 31, 2002, the clerk issued the final judgment pursuant to the district court's instruction. The Farms filed a timely notice of appeal from that final judgment.
 
 II.
 
 20
 Before we may turn to the standing and Gwaltney issues, we must first determine what is properly before this court on appeal under the terms of the parties' Consent Order. We engage in this interpretive exercise on a de novo basis. See Kenny v. Quigg, 820 F.2d 665, 670 (4th Cir.1987) ("[T]he construction of disputed terms of a consent order is an issue of law that is freely reviewable on appeal.").
 
 
 21
 The Consent Order entered into by the parties provides that ACA's participation in the settlement is contingent upon "their ultimate success on the issues presented by Defendants' Standing and Gwaltney Motions." J.A. 1737 (emphasis added).[6] The Consent Order further provides that "[u]pon entry of this Order and the Consent Decree, there shall be no litigation of issues in this case other than Defendants' Standing and Gwaltney Motions, litigation costs and any issues necessary to enforce the terms and conditions of the Consent Decree." J.A. 1738 (emphasis added). The Consent Order also allows continuing discovery on the standing and Gwaltney issues and provides for factual findings and conclusions of law on those issues if necessary. See J.A. 1739 ("Prior to the full adjudication of Defendants' Standing and Gwaltney Motions, Citizen Plaintiffs shall have the right to obtain discovery and to seek any finding of fact or conclusion of law for any alleged violation relevant to the Article III standing and/or Gwaltney issues."). Finally, the Farms agreed that they would
 
 
 22
 (a) waive all defenses that they might have asserted as to Citizen Plaintiffs' right to relief set forth in the attached Consent Decree, except for the defenses set forth in Defendants' Standing and Gwaltney Motions; ... (c) maintain their right to challenge the proof of any alleged violation, including any violation alleged in the future, during the adjudication of Defendants' Standing and Gwaltney Motions; ... (e) shall not reassert standing or Gwaltney as a defense to Citizen Plaintiffs' claims after final adjudication of Defendants' Standing and Gwaltney Motions.
 
 J.A. 1739-40.[7]
 
 23
 We think the terms of the Consent Order clearly contemplate the ability of the parties to engage in litigation that would follow naturally from the district court's resolution of the specified motions. For example, the provisions cited above that allow for factual findings by the district court and for the ability of the Farms to challenge ACA's proof of continuing violations would only be necessary if the order allowed for a trial on the Gwaltney issue in the event that the Farms lost their motion for summary judgment on that issue.[8]
 
 
 24
 The Consent Order is less clear with respect to the possibility of allowing appeal from decisions that were made prior to the resolution of the Standing and Gwaltney Motions. We need not resolve this interpretive issue, however, as it is only relevant with respect to the district court's initial judgment as to standing. As we explain below, we conclude that the district court erred by failing to grant the defendants' motion for reconsideration of its standing judgment, and accordingly we need not determine whether the original judgment is before us by virtue of the Consent Order since it is clearly before us pursuant to a successful motion for reconsideration.
 
 III.
 
 25
 Having resolved the interpretive dispute surrounding the Consent Order, we turn next to the standing issue. By the terms of the Consent Order, we are presented with the district court's denial of the Farms' motion for reconsideration of the court's standing judgment. ACA argues that the denial of the motion for reconsideration should be analyzed under the law of the case doctrine and should only be overturned if the denial constituted an abuse of discretion. In other words, the district court could deny the motion if, as it stated, the Farms had not shown "(1) an intervening change in controlling law; (2) the discovery of new evidence not previously available; and (3) the need to correct clear or manifest error in law or fact, to prevent manifest injustice." J.A. 1744 (internal quotation marks omitted). The Farms argue that this court is required to review the standing issue de novo and to take into consideration all the evidence relevant to the issue, including their new evidence. The parties also dispute the merits of the standing issue. We consider each of these issues, the procedural and the substantive, in turn.
 
 A.
 
 26
 In order to resolve the dispute regarding the propriety of the district court's denial of reconsideration, we must first ascertain the nature of the district court's standing judgment. On September 2, 1998, the district court issued what it titled a "Declaratory Judgment on Standing." The decision stated simply:
 
 
 27
 For the reasons set forth in the plaintiffs' briefs filed in support of their Motion for Declaratory Judgment That They Have Standing, that motion is ALLOWED. Accordingly, this court hereby DECLARES that the plaintiffs have Article III standing to prosecute this citizen's suit pursuant to § 505 of the [CWA] ... against defendants Murphy Farms, Inc., and D.M. Farms of Rose Hill, L.L.C., for alleged repeated violations of §§ 301 and 402 of the [CWA]....
 
 
 28
 J.A. 1245.
 
 
 29
 While the district court termed the order a declaratory judgment, we think it clear that the judgment was in fact simply a grant of partial summary judgment on an element of ACA's case. ACA filed a complaint alleging jurisdiction under section 505(a) of the CWA. ACA did not at any time invoke the court's jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, when seeking judgment on the standing issue. Nor could it have with respect to only the standing issue, for such was not itself an independent claim. Rather, ACA was simply asking for an early decision on one of the jurisdictional prerequisites to the consideration of its case on the merits. Attached to its brief was the typical evidence — affidavits from members and expert testimony — that is usually used to establish standing. Thus, though it did not title it as such, ACA's motion was in content and substance a motion for summary judgment. It is simply a misnomer to call ACA's motion, or the resulting relief granted for that matter, "declaratory."
 
 
 30
 With the labeling issue resolved, the proper standard by which to assess the propriety of the district court's denial of reconsideration becomes clear. True declaratory judgments, like other final orders, trigger heightened standards for reconsideration. See Fed.R.Civ.P. 59(e); id. 60(b). This is understandable, as significant time and resources are often invested in arriving at a final judgment. Unlike a true declaratory judgment, an order of partial summary judgment is interlocutory in nature. See, e.g., 11 Moore's Federal Practice § 56.40[3] (Matthew Bender 3d ed.) ("A partial summary judgment order is interlocutory...."). Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment. See 12 Moore's Federal Practice § 60.23 ("Rule 60(b) does not govern relief from interlocutory orders...."). This is because a district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted. See Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1469 (4th Cir.1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment."); cf. Fed. R.Civ.P. 54(b) (providing that interlocutory orders that resolve fewer than all claims are "subject to revision at any time before the entry of [final] judgment"). Said power is committed to the discretion of the district court, see Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 12, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (noting that "every order short of a final decree is subject to reopening at the discretion of the district judge"), and doctrines such as law of the case, which is what the district court apparently relied on in this case, have evolved as a means of guiding that discretion, see Sejman v. Warner-Lambert Co., Inc., 845 F.2d 66, 69 (4th Cir.1988) (noting that earlier decisions of a court become law of the case and must be followed unless "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." (internal quotation marks omitted)).
 
 
 31
 Law of the case is just that however, it does not and cannot limit the power of a court to reconsider an earlier ruling. The ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law. Though that obligation may be tempered at times by concerns of finality and judicial economy, nowhere is it greater and more unflagging than in the context of subject matter jurisdiction issues, which call into question the very legitimacy of a court's adjudicatory authority. These questions are of such overriding import that the Supreme Court has, in other contexts, carved out special exceptions for them to the general rules of procedure. So, for example, a party can challenge subject matter jurisdiction for the first time on appeal even though, in most contexts, issues not raised below are considered waived. See, e.g., Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) ("No party can waive the [subject matter jurisdiction] defect or consent to jurisdiction."). Thus, the Supreme Court itself has decided that the value of correctness in the subject matter jurisdiction context overrides at least some of the procedural bars in place to protect the values of finality and judicial economy. See 18B Wright, Miller & Cooper, Federal Practice and Procedure § 4478 (2d ed. 2002) ("Even after the first final judgment, the nature of some issues may encourage reconsideration; the most obvious illustration is provided by the rule that federal subject-matter jurisdiction remains open until there is no more opportunity to continue the proceeding by appeal."). Law of the case, which is itself a malleable doctrine meant to balance the interests of correctness and finality, can likewise be calibrated to reflect the increased priority placed on subject matter jurisdictional issues generally, and Article III standing in particular which represents "perhaps the most important" of all jurisdictional requirements. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Accordingly, we hold that a district court's otherwise broad discretion to reconsider interlocutory orders is narrowed in the context of motions to reconsider issues going to the court's Article III subject matter jurisdiction. See 18B Wright, Miller & Cooper, Federal Practice and Procedure § 4478.5 ("The force of law-of-the-case doctrine is affected by the nature of the first ruling and by the nature of the issues involved. If the ruling is avowedly tentative or the issues especially important, it may be said that law-of-the-case principles do not apply."); Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 118 (3d Cir.1997) (concluding that law of the case did not prevent reconsideration of standing decision because "the concerns implicated by the issue of standing ... trump the prudential goals of preserving judicial economy and finality"); CNF Constructors, Inc. v. Donohoe Const. Co., 57 F.3d 395, 397 n. 1 (4th Cir.1995) (concluding that law-of-the-case doctrine did not prevent an appellate court from revisiting a prior ruling of a motions panel on the court's jurisdiction because (1) law of the case is discretionary, not mandatory, (2) motions panels are often not presented with full briefing and argument, and (3) a court must dismiss an appeal when it lacks jurisdiction).
 
 
 32
 Applying that principle to this case, we cannot help but conclude that the district court abused its discretion in denying the Farms' reconsideration request. ACA's motion for a judgment on standing came a mere three months after it initiated suit. The district court's decision on the issue was also rendered early in the litigation, before there had been much factual development, discovery, or opportunity for the defendants to consult experts. While a ruling on the standing issue at that time may have served beneficial purposes, such as isolating the real issues in the case and allowing the plaintiffs to test the sufficiency of their own evidence, it should not be accorded the preclusive effect of a decision rendered after full trial, or even a decision rendered after full discovery. Against whatever finality interest would inure to such a ruling is stacked the paramount importance of achieving a correct judgment on the issue of Article III standing. In this case, the defendants presented evidence going to the standing issue that had not been previously considered by the district court. Indeed, as we explain more fully below, while ACA has proffered enough evidence to establish standing, the issue is close and the district court should have been receptive to evidence that might have tipped the balance of the analysis against standing. For these reasons, we think it clear that this situation presents the type of exceptional circumstances justifying reconsideration and renders the district court's denial of such an abuse of discretion. See Magnesium Elektron, 123 F.3d at 118.[9]
 
 B.
 
 33
 While the district court erred in denying reconsideration, we think remand unnecessary in this instance. This is because, even crediting the Farms' experts' opinions, the district court's initial judgment with respect to standing was correct.
 
 
 34
 The basic legal requirements for standing are well established. An association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Com'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Here, the plaintiff-associations assert representational standing on behalf of their members who use waters downstream of the defendants' farms for both recreational and commercial purposes. The Farms challenge only the first prong of associational standing, arguing that the plaintiffs' members do not have standing in their own right to prosecute this action.
 
 
 35
 With respect to individuals' standing, "at an irreducible minimum, Art. III requires the party who invokes the court's authority to show [1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ... and [2] that the injury fairly can be traced to the challenged action and [3] is likely to be redressed by a favorable decision." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (internal quotation marks and citations omitted); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). These three prongs are most commonly referred to as (1) injury in fact, (2) traceability, and (3) redressability. The Farms assert that the plaintiffs have failed to establish the first two prongs of standing — injury in fact and traceability.
 
 
 36
 In the environmental litigation context, the standing requirements are not onerous. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons `for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Laidlaw, 528 U.S. at 183, 120 S.Ct. 693 (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). In Friends of the Earth, Incorporated v. Laidlaw Environmental Services (TOC), Inc., the Supreme Court considered whether organizational members' affidavits, which stated that their use and enjoyment of waters downstream from the defendant's facility had decreased due to fears of the pollutants discharged by the defendant, satisfied the injury-in-fact requirement. Laidlaw, 528 U.S. at 180-85, 120 S.Ct. 693. The defendant in Laidlaw engaged in what the Court described as "continuous and pervasive illegal discharges of pollutants." Id. at 184, 120 S.Ct. 693; see also id. at 176, 120 S.Ct. 693 ("The District Court later found that Laidlaw had violated the mercury limits on 489 occasions between 1987 and 1995."). Some of the affiants used waters within a couple miles from the defendant's facility, while others used waters as much as forty miles away. Id. at 181-83, 120 S.Ct. 693. The Court rejected the defendant's argument that the plaintiffs lacked standing because they had not demonstrated proof of harm to the environment. Id. at 181, 120 S.Ct. 693. Rather, "[t]he relevant showing for purposes of Article III standing ... is not injury to the environment but injury to the plaintiff." Id. Such injury had been established by the affiants in Laidlaw because "the affidavits and testimony presented by FOE [the plaintiff-organization] in th[at] case assert[ed] that Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests." Id. at 183-84, 120 S.Ct. 693.
 
 
 37
 We applied Laidlaw in Friends of the Earth, Incorporated v. Gaston Copper Recycling Corporation. The standing inquiry in Gaston Copper also focused on members of organizations that were downstream from the defendant's facility. The district court found that the plaintiffs had not shown that they had suffered injury because "[n]o evidence was presented concerning the chemical content of the waterways affected by the defendant's facility. No evidence of any increase in the salinity of the waterways, or any other negative change in the ecosystem of the waterway was presented." Gaston Copper, 204 F.3d at 155 (internal quotation marks omitted). We reversed. We noted that one of the affiants had alleged a concern of health risks that affected his recreational use of the waterway. We concluded that such fear was reasonable because the defendant was placing chemicals into the waters that could have adverse health and environmental effects. Id. at 157; see also id. ("They allege that these reports show over 500 violations of the company's discharge limits, including unlawful releases of cadmium, copper, iron, lead, and zinc, as well as pH violations."). We interpreted Laidlaw as requiring "no evidence of actual harm to the waterway." Id. at 159. For that reason, "[b]y producing evidence that Gaston Copper is polluting Shealy's [the affiant's] nearby water source, CLEAN [the plaintiff-organization] has shown an increased risk to its member's downstream uses. This threatened injury is sufficient to provide injury in fact." Id. at 160. Traceability was likewise satisfied because the plaintiff-organization had "charged that (1) Gaston Copper exceeds its discharge permit limits for chemicals that cause the types of injuries Shealy alleges and that (2) Shealy's lake lies within the range of that discharge." Id. at 162. No additional evidence was required by the court.
 
 
 38
 In their original motion for judgment on the standing issue in the case before us, each plaintiff-association introduced affidavits from several of its members as well as expert testimony. We describe below the statements of three affiants, which are representative of the types of allegations made by all. The American Canoe Association presented an affidavit by Douglas Little. Little lives on the banks of Six Runs Creek approximately four miles downstream from Mag 4. Little testified that his family uses the creek almost daily for swimming, drinking, and fishing. Over the years, Little has noticed that the waters of Six Runs Creek have become darker and there is more algae. He has seen fewer fish swimming in the waters and has noted dead fish floating on the surface. He also described a foul odor that has developed. Because of these changes, he testified that his enjoyment of the creek has diminished and that he and his family have curtailed their use of the creek out of health concerns. He believes that the pollutants from the defendants' farms are responsible, in part, for his diminished use of the creek.
 
 
 39
 The Professional Paddlesports Association introduced an affidavit by Joseph Jacob. Jacob operates a river guide business and is himself an avid paddler and professional guide. He frequently guides customers on the Black River. During his trips on the Black River, Jacob has smelled hog waste and noticed foam in the water, which he believed was an indication of decomposing organic matter. Jacob's customers have also expressed concerns about water quality and he is worried that he will lose business when his customers learn about discharges of animal waste into the river. He is personally concerned about the harmful impact of the defendants' discharges on fish and plant life in the Black River.
 
 
 40
 The Conservation Council of North Carolina presented the testimony of David Martin. Martin has canoed both Six Runs Creek and the Black River. His fear of pollution has kept him from swimming in, bathing in, or drinking the water from either. Martin, an artist, testified that the uncleanly appearance of Six Runs Creek and the Black River offends his aesthetic tastes. He has also noticed a decrease in fish populations. For all those reasons, his enjoyment of Six Runs Creek and the Black River has been diminished by the pollution he believes comes from the Mag 4 facility, among others.
 
 
 41
 The plaintiff-associations supported the affidavits of their members with the expert testimony of Dr. Bruce Bell. Dr. Bell, who holds a Ph.D. in Environmental Engineering, opined that the "swine waste discharged from the Mag 4 facility included high levels of oxygen demanding substances, ammonia-nitrogen, bacteria, viruses and other micro-organisms (measured as fecal coliform) and solids. When discharged to water bodies, these pollutants may have severe adverse environmental and human health effects." J.A. 242.[10] "[E]xcess fecal coliform bacteria in a receiving stream indicate contamination with fecal matter which may contain disease-carrying microbes. Drinking, swimming in, or eating fish from water containing excessive fecal coliform bacteria poses a serious health risk." J.A. 243. Dr. Bell also opined that fecal coliform from the two pre-suit discharges traveled down Six Runs Creek and well into the Black River. He testified that organic matter and ammonia contained in swine waste exert an oxygen demand in the water bodies. "Oxygen depletion can result in fish kills. In addition, methane, amines and sulfides are produced in anaerobic waters, causing the water to acquire an unpleasant odor, taste and appearance. Such waters are unsuitable for drinking, fishing and other recreational uses." J.A. 244. Furthermore, he explained how ammonia from the swine waste can ultimately contribute to algae blooms and eutrophication of the receiving waters.
 
 
 42
 With the aid of their own experts, the Farms argue that none of the hog waste from the two pre-suit discharges adversely impacted the environment in an area where the plaintiffs' members were. The defendants' experts opine that the environmental impact from the discharges would have extended no further than the upper reaches of Six Runs Creek. The experts also conclude that the discharges would have had no long term effects on either Six Runs Creek or the Black River. Thus, argue the defendants, any changes to water quality in Six Runs Creek and the Black River attributable to their discharges were fleeting and insignificant. With respect to traceability, the Farms argue that other upstream animal farms were likely responsible for whatever injuries, if any at all, the plaintiffs' members suffered. The Farms' experts indicated that there was evidence of animal waste in the waters upstream from where the Mag 4 discharges took place.
 
 
 43
 While the case for injury-in-fact is weaker here than was the case in either Laidlaw or Gaston Copper due to the relatively minimal number of discharges, the affiants have still averred the types of fear and concern found sufficient in those cases. As described above, affiants Little, Jacob, and Martin, all expressed concerns regarding the quality of water in Six Runs Creek and the Black River. These concerns affected their aesthetic, recreational, and, in some cases, economic interests in the waters. Dr. Bell's testimony demonstrates that these fears were reasonable. Swine waste contains bacteria and chemicals that can be harmful to humans, and it can cause the algae blooms, fish kills, foul odors, and murky conditions experienced by the affiants.
 
 
 44
 The reports of the Farms' experts do not undermine this conclusion. They are focused on potential environmental impact. But, as the Supreme Court admonished in Laidlaw, the appropriate point of reference is not harm to the environment, but harm to the plaintiff. In both Laidlaw and Gaston Copper, the Court explicitly rejected the notion that plaintiffs must prove some adverse environmental impact. Rather, it was deemed sufficient in each case that the affiant used an area subject to contamination from the discharge. Dr. Bell opined that the waste would have reached both Six Runs Creek and the Black River. Neither of the Farms' experts deny that the waste reached the Black River and traveled for some distance down that river. Thus, the plaintiff-organizations' members, who used either Six Runs Creek or the Black River, and sometimes both, have clearly established injury in fact because they have alleged harm to their recreational, aesthetic, and commercial interests and they were within the area of contamination around the time of the discharges.
 
 
 45
 The case for traceability is also closer here, but, once again, ultimately sufficient. In order to satisfy the traceability requirement, "[r]ather than pinpointing the origins of particular molecules, a plaintiff `must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern." Gaston Copper, 204 F.3d at 161 (quoting Natural Resources Defense Council, Inc. v. Watkins, 954 F.2d 974, 980 (4th Cir. 1992)). Here, it is uncontroverted that the Farms discharged large quantities of swine waste into waters of the United States on at least two occasions. As described above, swine waste, when introduced into streams and rivers, is capable of causing the kinds of injuries complained of by the plaintiff-organizations' members. And, as Dr. Bell's uncontroverted testimony demonstrates, the affiants were in the geographic area of concern. It is a closer question here than was the case in either Laidlaw or Gaston Copper because third parties could also have contributed to the alleged injuries. There were other upstream farms, which could have independently discharged waste into the waters. The fact that other farms may have contributed to the pollution problems complained of by the affiants in this case does not negate the fact that the defendants' discharges still potentially harmed them. It would be strange indeed if polluters were protected from suit simply by virtue of the fact that others were also engaging in the illegal activity.
 
 
 46
 As the defendants' new evidence does not call into question the district court's grant of partial summary judgment to ACA, we affirm that ruling.
 
 IV.
 
 47
 ACA's jurisdictional troubles are not over with the conclusion that it is has standing to bring suit, for it must still demonstrate that it meets the requirements of section 505(a) of the CWA, as interpreted by the Supreme Court and this Circuit in Gwaltney I and Gwaltney II, respectively. The parties seek to litigate the merits of the Farms' Gwaltney Motion on appeal. As they did in Murphy Farms I, however, the parties misconceive the procedural posture of this case. Their misunderstanding is understandable if for no other reason than that it apparently flows from the district court's own misconception of what it had actually decided. In identifying the current posture of this case we must untangle the procedural knot that led to the confusion below.
 
 
 48
 As noted above, a citizen-plaintiff seeking to sue under section 505(a) of the CWA must show that the defendant's violations of the CWA are ongoing at the time of suit. As the Supreme Court held in Gwaltney I, this means that a plaintiff must allege either continuous or intermittent violations. Gwaltney I, 484 U.S. at 64, 108 S.Ct. 376. As with other jurisdictional matters, the plaintiff's burden to establish an ongoing violation evolves over the course of the litigation. At the motion to dismiss stage, a plaintiff need only have pled facts sufficient to support such a finding. A plaintiff will survive summary judgment on the Gwaltney requirement if he can show either that there is no genuine dispute as to material fact on the issue and that the plaintiff is entitled to judgment as a matter of law or that there is a genuine factual dispute and a reasonable jury could find for the plaintiff on the issue. Finally, at trial, a plaintiff may satisfy his burden "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." Gwaltney II, 844 F.2d at 171-72.
 
 
 49
 It is that final step — actual proof at trial — that is missing from this case. In order to understand why this is so, we trace the procedural history of this issue. In its December 22, 1998 decision, the district court ruled upon cross motions for summary judgment by the parties. One of the arguments made by the Farms at that time was that ACA's case should be dismissed because it had failed to demonstrate ongoing violations as required by Gwaltney II. The court explicitly rejected that argument, see J.A. 1255 ("[t]he defendants' argument[] ... that the claim is based on past events ... [is] unavailing"), denied the Farms' motion for summary judgment, and granted ACA's partial motion for summary judgment. It appears, as best we can understand, that the district court thought it had made an affirmative finding as to the presence of ongoing violations at that point. It later described its December 22, 1998 order as "allowing summary judgment in the plaintiffs' favor on the defendants' Gwaltney motion." J.A. 1758.
 
 
 50
 We made clear on appeal, however, that the district court had in fact not made any finding as to continuing violations. As we said in Murphy Farms I, "[n]othing in the district court's [December 22, 1998] order reflects that it made any finding as to the possibility of future discharge." Murphy Farms I, 2000 WL 328027, at *3.[11] By law, the conclusions reached in Murphy Farms I are binding on the district court, and they are binding on this panel as well; whatever the district court might have intended in its December 22, 1998 order, as a legal matter there can be no doubt that it did not make a factual finding as to the possibility of future discharges.
 
 
 51
 The next point we come to on the time line of the Gwaltney issue is the Farms' March 5, 2001, motion for summary judgment on that issue. As noted above, that motion the district court denied, but it did not then, nor thereafter, grant summary judgment on the Gwaltney issue to the plaintiffs. The next, and final, chronological point is the district court's entry of final judgment. In its final judgment order, the district court simply stated that CWA jurisdiction existed, apparently implicitly determining that the plaintiffs had satisfied their burden under Gwaltney II. It does not appear that the district court ever held a trial on that issue and its assertion of jurisdiction in its final judgment is not accompanied by any findings of fact as required by Federal Rule of Civil Procedure 52(a). See Fed.R.Civ.P. 52(a).
 
 
 52
 Such a judgment, rendered without a trial and based on no discernable factual findings, was erroneous. While the Farms may not ultimately prevail on their Gwaltney challenge, they are entitled to present their case on that issue at trial,[12] at which point ACA will have to come forward with evidence, rather than mere allegations, in order to prevail on the issue. Given the absence of a trial or factual findings below, we think it clear that the proper resolution of the current appeal is for this court to vacate the district court's final judgment with respect to section 505 jurisdiction and remand for a trial and factual findings in compliance with Rule 52(a) on the Gwaltney issue, at which point an appeal on the merits of that issue will lie.
 
 
 CONCLUSION
 
 
 53
 The judgment of the district court is affirmed in part and vacated in part and the case is remanded for further proceedings consistent with this opinion.
 
 
 AFFIRMED IN PART; VACATED AND REMANDED IN PART
 
 
 
 Notes:
 
 
 [1]
 The runoff occurred at about two miles from the confluence of the tributary and Six Runs Creek. Six Runs Creek flows for approximately fourteen to fifteen miles before it feeds into the Black River. The Black River flows into the Cape Fear River about fourteen miles above Wilmington, North Carolina
 
 
 [2]
 The American Canoe Association is a membership organization dedicated to the preservation and protection of America's waterways. The Professional Paddlesports Association is a membership trade association of paddlesport businesses dedicated to providing the public with safe, enjoyable commercial on-water recreational experiences and to protecting America's waterways. The Conservation Council of North Carolina is a membership organization committed to protecting the environmental resources of North Carolina through participation in legislative, judicial, and regulatory processes
 
 
 [3]
 On June 21, 2000, North Carolina issued an NPDES permit covering Mag 4
 
 
 [4]
 The "new evidence" proffered by the Farms consisted of reports of their own expert witnesses. The experts opined that the two pre-suit discharges would not have impacted the environment in the areas where the plaintiff-organizations' members were
 
 
 [5]
 The test referenced is that created byGwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) [hereinafter Gwaltney I]. Gwaltney I held that in order for a citizen-plaintiff to sue under section 505(a) of the CWA, the plaintiff must allege ongoing CWA violations of a continuous or intermittent nature. In other words, the complaint cannot be based wholly on past violations. Our court has interpreted Gwaltney I as requiring that plaintiffs, at the appropriate stage in the litigation, actually prove ongoing violations. See Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 171 n. 1 (4th Cir.1988) [hereinafter Gwaltney II].
 
 
 [6]
 Earlier in the Consent Order, the Farms' Standing andGwaltney Motions were defined as their March 6 motion for reconsideration of the district court's declaratory judgment on standing, and their March 5 motion for summary judgment on Gwaltney.
 
 
 [7]
 The Consent Order also provides that "[f]or purposes of this Order, the term full or final adjudication shall mean adjudication through all levels of judicial review." J.A. 1740
 
 
 [8]
 The Farms' agreement that it "shall not reassert standing orGwaltney as a defense to Citizen Plaintiffs' claims after final adjudication of Defendants' Standing and Gwaltney Motions" might be read as precluding the Farms from seeking a trial on the Gwaltney issue in the event that they lost on their summary judgment motion. However, we think the better interpretation, given the district court's characterization of both motions as motions for reconsideration, is simply that the Farms agreed not to file additional motions for reconsideration after final adjudication on the merits.
 
 
 [9]
 We are mindful of the Supreme Court's dicta inChristianson v. Colt Industries Operating Corp., 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), that law of the case has purchase even with respect to jurisdictional questions. Considering the application of law of the case to circuit court decisions to transfer cases, the Court stated that "[t]here is no reason to apply law-of-the-case principles less rigorously to transfer decisions that implicate the transferee's jurisdiction. Perpetual litigation of any issue — jurisdictional or nonjurisdictional — delays, and therefore threatens to deny, justice." Id. at 816 n. 5, 108 S.Ct. 2166. It does not follow from this statement, referring as it did to law of the case as it applies to jurisdictional transfer decisions, that lower courts cannot apply less rigorous law-of-the-case principles to interlocutory orders that implicate Article III subject matter jurisdiction. See Magnesium Elektron, Inc., 123 F.3d at 118.
 Nor should our decision today be read as opening the door to perpetual litigation of subject matter jurisdiction issues. Law-of-the-case principles are weakened but still present. And a court still retains the ability to impose sanctions on an attorney who it concludes is filing motions for reconsideration in bad faith or simply in an attempt to prolong the litigation.
 
 
 [10]
 Fecal coliform is a type of bacteria associated with animal waste. It is used as an indicator of such
 
 
 [11]
 As we noted, discovery had not even commenced on theGwaltney issue at that time. Id.
 
 
 [12]
 As we described above, we do not interpret the Consent Order as precluding a trial on theGwaltney issue.